**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellant,**

**v.**

**Verle MANGUM, Defendant–Appellee.**

**No. 02SA70.**

Supreme Court of Colorado,
En Banc.

June 24, 2002.

Peter G. Hautzinger, Chief Deputy District Attorney, Richard B. Tuttle, Deputy District Attorney, Grand Junction, Colorado, Attorneys for Plaintiff–Appellant.

Richard Gurley, Colleen B. Scissors, Grand Junction, Colorado, Attorneys for Defendant–Appellee.

Justice COATS delivered the Opinion of the Court.

The People appealed pursuant to section 16–12–102(2), 6 C.R.S. (2001), and C.A.R. 4.1, challenging the district court's order suppressing certain of the defendant's statements to the police. Because we agree that the statements were the product of custodial interrogation without the benefit of *Miranda* warnings, the district court's order is affirmed.

## I.

Following his apprehension and arrest on May 5, 2001, the defendant was charged with the five-year-old murders of Janet and Jennifer Davis, child abuse resulting in death, sexual assault on a child, and a number of violent crime and juvenile direct file counts. The defendant moved to suppress the statements that he made to the police on the day of his arrest. After hearing the defendant's motion on February 4, 2002, the district court made detailed written findings of fact and conclusions of law.

According to the district court's findings, on April 30, 2001, the Mesa County Sheriff's Department received information from the Department of Human Services that Shawna Mangum had implicated her husband, Verle, in the double homicide. She also told a Human Services employee that Mangum had said he would commit suicide if he were contacted by the police. On May 4, 2001, the Sheriff's Department obtained a Crim. P. 41.1 order for non-testimonial identification evidence.

Based on information that the defendant would be driving from Utah to Grand Junction sometime on May 5, 2001, to pick up his two-year-old son, officers began surveillance of his wife's residence, intending to interrogate the defendant and then execute the non-testimonial identification order. The officers watched the car in which the defendant was riding leave his wife's residence carrying two children, who were apparently not in car seats, and a crib poorly secured to the roof, and they decided to pull it over. While the driver was being questioned about documentation, the defendant agreed to speak with another officer outside the car. After being told that the police were reopening the Davis homicide case, that they would like him to come to the Sheriff's Department to speak with them, and that Human Services wanted them to take custody of his son, the defendant fled.

Two officers chased him, ordered him at gunpoint to drop a knife he had put to his

throat, and sprayed him in the face with pepper spray after he sliced his throat several times. When the defendant escaped and ran again, he was pursued by officers on foot and in a patrol car, and was ultimately ordered at gunpoint to come out of the bushes where he was hiding with his hands up. The defendant complied, asking not to be hurt and indicating that he was done. When it was clear that the defendant no longer had a knife, he was ordered to drop to his knees and then to his stomach. He was handcuffed and searched and his wallet was seized. Despite the large gashes on the defendant's throat and the arrival of paramedics with an ambulance, one of the police officers ordered a delay in medical attention to speak with the defendant for a few minutes alone.

After another officer told him that he was not under arrest but had been handcuffed for his own protection, the defendant said that he had "screwed up" his life and that his life was over. When the officer indicated that they could work things out, the defendant responded that he would not survive in prison and that he was seventeen at the time, and after being further consoled by the officer, that he was going to prison and that his life was over. After telling the defendant that no one knew what would happen and that the most important thing was to take responsibility, the officer questioned him about what happened, and the defendant gave details of the murders.

Following several minutes of conversation, the defendant was examined by the paramedics and, still cuffed, was strapped to a gurney and taken by ambulance to the hospital. The officer continued to interrogate the defendant as he was being treated for his injuries on the way to the hospital, encouraging him as he gave more details by telling him that he was starting to take responsibility · and could help the Davis family by revealing what happened and why. The defendant then gave considerably more detail about how and why he committed the murders.

After arriving at the hospital, the defendant remained handcuffed but was again told that he was not under arrest and that the handcuffs were for his own protection. The deputy who "stood by" the defendant's bed was told that the defendant was not in custody but was detained for execution of the Rule 41.1 order. About three hours later, the defendant was taken to the Sheriff's Department, where blood was drawn and fingerprints taken. Between two and three hours later, the defendant was placed in jail. Although the defendant made other statements during the course of these events, he was never told that he was free to leave or advised of his constitutional rights.

In a detailed, written analysis of the controlling law and its application to these facts, the trial court concluded that in the totality of the circumstances the defendant was in custody for purposes of his entitlement to *Miranda* warnings from the time he was handcuffed. Although it found all of his statements voluntary in the constitutional sense and many of them actually volunteered rather than made in response to interrogation, it suppressed those of the defendant's statements that were made in response to interrogation conducted after he was handcuffed. The prosecutor filed an interlocutory appeal, challenging the trial court's determination that the defendant was in custody for purposes of *Miranda* and asserting that suppression was not the proper remedy in any event because the police held a good faith belief that they lacked probable cause to arrest the defendant at the time of the questioning.

## II.

▮ There are two federal constitutional bases for the requirement that a confession be voluntary in order to be admitted into evidence: the Due Process Clause of the Fourteenth Amendment and the Fifth Amendment privilege against self-incrimination. *See Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The due process or "voluntariness" test takes into consideration the totality of all the surrounding · circumstances—both the characteristics of the accused and the details of the interrogation—to determine whether the accused's will was actually overborne by coercive police conduct. *Id.* at 2331; *People v. Valdez*, 969 P.2d 208, 211 (Colo.1998). However, because the inherently coercive na-

ture of custodial police interrogation heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment, the Supreme Court has also laid down concrete constitutional guidelines governing the admissibility of statements given during custodial interrogation. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Statements made during custodial police interrogation are admissible in the prosecution's case in chief only if the person making them has already been properly advised concerning his right to remain silent and his right to have a lawyer, and if he has made a voluntary, knowing, and intelligent waiver of those rights. *See id.* at 444, 86 S.Ct. 1602.

We have often, and recently, considered the nature of custody entitling a suspect to the benefit of Miranda warnings before interrogation. *See, e.g., People v. Matheny,* 46 P.3d 453 (Colo.2002); *People v. Taylor,* 41 P.3d 681, 689–93 (Colo.2002); *People v. Polander,* 41 P.3d 698, 705 (Colo.2001). It is now clearly established that an interrogation is custodial within the meaning of the phrase "custodial interrogation" not only if it occurs while the person making the statement has been formally arrested but whenever his freedom of action is curtailed to a degree associated with formal arrest. *See Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Matheny,* 46 P.3d at 463.

A court must examine all of the circumstances surrounding the interrogation to determine whether there was a restraint on freedom of movement of the degree associated with a formal arrest. *Stansbury,* 511 U.S. at 322, 114 S.Ct. 1526; *Matheny,* 46 P.3d at 464. Because it was the compulsive aspect of custodial interrogation rather than the strength or content of the government's suspicions that led the Supreme Court to impose the *Miranda* safeguards, *see Beckwith v. United States,* 425 U.S. 341, 346–47, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Matheny,* 46 P.3d at 464, the determination of custody

depends on the objective circumstances of the interrogation rather than the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury,* 511 U.S. at 323, 114 S.Ct. 1526; *Matheny,* 46 P.3d at 464. A person being interrogated by the police is therefore in custody if, but only if, he has been formally arrested or in the totality of the circumstances a reasonable person in the suspect's position would have felt that his freedom of action had been curtailed to a degree associated with a formal arrest. *See Matheny,* 46 P.3d at 465–66.

We have in the past articulated a number of considerations relevant not only to the question whether a reasonable person would feel free to leave but whether he would also believe he was in police custody of the degree associated with a formal arrest rather than with a brief investigatory detention. *Id.* at 465; *see also Polander,* 41 P.3d at 705. While none of these factors is dispositive, as a whole they provide an objective basis for determining custody. The nature and degree of the force used by the police to restrain the defendant in this case, whether or not it was reasonable under the circumstances and whether or not it would have been justified even in the absence of probable cause for an arrest, clearly showed it to be force of a kind more traditionally associated with the concepts of custody and arrest than with a brief investigatory detention. *See id.; People v. Breidenbach,* 875 P.2d 879, 886 (Colo.1994).

The defendant was vigorously chased by a number of officers on foot and by vehicle, threatened at gunpoint, sprayed in the face with mace, and ultimately subdued and handcuffed. At the time, the car in which he was riding had already been stopped by the police; he had been asked to come to the Sheriff's Department to speak with them about a double homicide; and he had been told that Human Services had requested that his son be taken into protective custody. He had run from the officers and sliced his own throat rather than accompany them. Although he was told that he was not under arrest, a separate legal basis for the defendant's restraint did not mitigate the degree

of force used to acquire and maintain that restraint or the fact that he was clearly not about to be released after a brief detention.

 While exhibiting guns or using handcuffs may at times amount to reasonable safety precautions that do not necessarily elevate a seizure based on less than probable cause to a full arrest, Fifth Amendment protections are concerned with the likely coercive effect of this degree of force on a reasonable person in the suspect's position. Neither the reasonableness of the force nor its legal justification alters its likely coercive effect. Where it would appear to a reasonable person in the defendant's position that his freedom of action or movement had been curtailed to a degree associated with a formal arrest, in terms of both severity and duration, he is entitled to a *Miranda* advisement before being interrogated. *Miranda* never bars interrogation itself no matter how coercive the environment; it merely ensures that a defendant's statements made during custodial interrogation may not be used in the case against him unless he was adequately warned of, and waived, his right not to make them. The defendant was neither warned of his *Miranda* rights nor released from custody at any time prior to being placed in jail.

### III.

The People also assert that suppression of the defendant's statements made during custodial interrogation is not a proper remedy for the failure of the police to warn him of his *Miranda* rights because their belief that they did not at that time have grounds to arrest him amounted to a "good faith mistake," as defined at section 16–3–308 6 C.R.S. (2001). The argument confounds Fourth Amendment prohibitions against unreasonable seizures of the person with *Miranda's* safeguards against custodial interrogation. The custodial nature of interrogation is not conditioned upon probable cause for an arrest. Neither Colorado nor federal law purports to recognize a "good faith" exception to the exclusionary remedy for statements taken in violation of *Miranda.*

### IV.

We agree that police interrogation of the defendant after he was handcuffed in this case was custodial and that there is no good faith exception to the exclusionary remedy for a Miranda violation. The order of the district court is therefore affirmed, and the case is remanded for further proceedings consistent with this opinion.