2017 CO 106

**The PEOPLE of the State of Colorado, Plaintiff-Appellant**

v.

**Sylvia GARCIA, Defendant-Appellee**

**Supreme Court Case No. 17SA219**

Supreme Court of Colorado.

December 11, 2017

Attorneys for Plaintiff-Appellant: Dave Young, District Attorney, Seventeenth Judicial District, Michael Whitney, Deputy District Attorney, Brighton, Colorado.

Attorneys for Defendant-Appellee: Douglas K. Wilson, Public Defender, Allen Chaney, Deputy Public Defender, Brighton, Colorado.

1. The mother's name is also Sylvia Garcia. We refer to the elder Sylvia Garcia as "the mother"

JUSTICE HOOD delivered the Opinion of the Court.

¶1 When Northglenn police officers went to Defendant Sylvia Garcia's house to do a welfare check on a child, they found an elderly woman in distress on the living room floor. They also noticed a padlock on the refrigerator in the kitchen and feces and bugs throughout the house. Medical personnel, additional police officers, firefighters, and a building inspector soon poured into the residence.

¶2 Garcia made several statements to the officers at the house, including that she was a caretaker of the elderly woman (her mother) and that the padlock was to keep her brother from eating food in the refrigerator. Garcia was later charged with two offenses relating to neglect of her mother and one count of child abuse.

¶3 The trial court granted Garcia's motion to suppress the statements she made during this encounter with the police at her house, concluding Garcia had been subjected to custodial interrogation and had not received a Miranda advisement. The People appeal that order.

¶4 Because we conclude Garcia was not in custody for Miranda purposes during the encounter, we reverse the trial court's order suppressing the statements.

## I. Facts and Procedural History

¶5 The following facts are based on the trial court's findings and undisputed testimony at the motions hearing.

¶6 Northglenn police officers received a report of a child living in dangerous conditions at Garcia's home. This prompted officers to conduct a welfare check. While speaking with a teenager who answered the door, three officers—including Officers Thomas and Smith—heard what sounded like a woman moaning. They forced entry into the house and found an elderly woman, Garcia's mother,[1] on a mattress on the living room floor. She was surrounded by dogs jumping on or around her, and she appeared to be asking

and the defendant Sylvia Garcia as "Garcia."

for help. The house smelled of urine, feces covered the floors, and the walls crawled with bugs. They called for medical assistance and additional officers.

¶7 Garcia came downstairs. Officers Smith and Thomas both asked Garcia if anyone else was in the house. Garcia told Officer Thomas no one else was home. Officer Smith said to Garcia, "Look, I don't want to place the paramedics and patrol officers in a dangerous situation. Is anybody home?" Garcia first responded no, but when Officer Smith asked again, she said her brother was upstairs.

¶8 Officers Lauck and Spresser joined the scene. Garcia gave Officer Lauck permission to go upstairs and search. Officers conducted a sweep of the rest of the house with their weapons in a "low ready" position, where the gun is held ready to fire, but pointed toward the ground. Officers Lauck and Spresser found Garcia's brother, Joseph, upstairs in a room filled with cups of urine, broken glass, feces, and insects. With his fingers stuffed in his mouth, Joseph was standing on a mattress and shaking. He told the officers he is schizophrenic. The officers discovered Joseph had an unrelated outstanding arrest warrant, so they took him into custody.

¶9 After coming back downstairs and seeing the padlock on the refrigerator, Officer Spresser asked Garcia why it was there. Garcia told Officer Spresser it was to keep her brother from eating the food in the refrigerator. According to Officer Spresser, she spoke with Garcia in a conversational tone in either the living room or the kitchen and that was the only question she asked Garcia.

¶10 Firefighters and a building inspector arrived. At some point during the incident, the building inspector condemned the house, put notices on the front door, and said no one could be inside.

¶11 The trial court found that the police ordered Garcia outside. Officer Thomas testified at the motions hearing:

I don't remember asking her to come outside. It was kind of a chaotic scene. There [were] a lot of people there coming in and out. I don't know if she was already outside and then I approached her outside. I don't remember asking her to step out and talk.

According to Officer Thomas, he was a couple of feet away from Garcia outside the house and there were likely two other officers around. Garcia largely ignored Officer Thomas, just responding, "I don't know," to his questions. She also kept using her phone. Officer Thomas couldn't recall whether he asked her or told her to stop using her phone and to talk to him. Regardless, she continued using her phone. Officer Thomas asked Garcia who took care of the mother. Garcia responded she was the caretaker. The conversation lasted a few minutes.

¶12 Officer Smith also spoke with Garcia outside, although he could not recall whether it was before or after Garcia spoke with Officer Thomas. He admitted he raised his voice when Garcia kept denying knowing what was going on and said something along the lines of "Come on, seriously?" Officer Smith also testified that he said, "Look, just tell me what's going on here. It's obvious this situation isn't good." Garcia told Officer Smith that she and her sister were the caretakers of the mother, but otherwise, continued to deny knowing what was going on. According to Officer Smith, the conversation lasted five to seven minutes, he was three or four feet away from Garcia, and there were several other officers outside during this conversation.

¶13 No one restrained Garcia during this encounter. Although the police officers were armed, they did not direct any of their weapons at Garcia. None of them gave Garcia a <u>Miranda</u> advisement.

¶14 Garcia was later arrested and charged with three counts: (1) Negligent Bodily Injury to an At-Risk Person, § 18-6.5-103(2)(c), C.R.S. (2017); (2) Neglect of an At-Risk Person, § 18-6.5-103(6), C.R.S. (2017); and (3) Child Abuse, § 18-6-401(1), (7)(b)(I), C.R.S. (2017). The first two counts were for the alleged neglect of Garcia's mother and the third for the alleged neglect of one of Garcia's children.

¶15 Defense counsel filed a motion to suppress all statements Garcia made during the encounter. The trial court granted the motion, finding the statements were voluntary,

but taken in violation of <u>Miranda</u>. In its analysis at the motions hearing, the trial court said:

- The police entered this home and they have their weapons drawn. ... This is an inherently coercive environment in the Court's estimation.

- I'm making an influential [sic] finding that the officers ordered her outside of the residence.

- Under these [sic] set of circumstances, although the officer said their questioning may have been conversational, it ignores the overall tone of this police/citizen encounter. It's inherently coercive. They have their weapons drawn.

- I do find that this is an inherently coercive set of circumstances. The police officers most definitely were interrogating Ms. Garcia.

- Frankly, the closest call about whether at that point in time and, chronologically, I think is with Spresser but still, overall, Spresser made those inquires [sic] while her fellow officers and herself were inside searching under those particular circumstances and obtained information from the brother which, in turn, prompted her to ask a very specific and, I believe under these circumstances, incriminating question about the padlock on the refrigerator. She already noted he was malnourished. I would presume that one of the government's arguments in this case is precisely that.

- With respect to Thomas, the initial contact with her coming downstairs and asking about who else is in the house, that to me also is really—when you look at their purpose, they're looking for kids. I do believe that is also reasonably likely to elicit an incriminating response. The outside interrogation clearly continued to be custodial and reasonably likely to elicit incriminating

responses with respect to Officer Thomas and then Officer Smith.

- With respect to Lauck, all we have there is she theoretically gave consent to go upstairs. I don't think consent is truly of any moment because I already found that the government met the emergency aid exception. I just don't think it's really part of the analysis given that particular finding.

¶16 The People bring this interlocutory appeal pursuant to section 16-12-102, C.R.S. (2017), and C.A.R. 4.1.

## II.  Analysis

¶17 We first outline the applicable standard of review for a <u>Miranda</u> custody determination. We then consider the legal standard for what constitutes custody for <u>Miranda</u> purposes, focusing on how location plays into the analysis. Finally, we apply that standard to the facts here, and conclude these circumstances do not constitute custody for <u>Miranda</u> purposes.[2]

### A.  Standard of Review

¶18 Whether a person is in custody for <u>Miranda</u> purposes presents a mixed question of law and fact. People v. Begay, 2014 CO 41, ¶ 9, 325 P.3d 1026, 1029. We defer to a trial court's findings of fact—provided that they are supported by the record—but we review de novo the trial court's legal conclusion that the facts constitute custody. People v. Sampson, 2017 CO 100, ¶ 16, 404 P.3d 273, 276. We may also consider undisputed facts in the record. People v. Pleshakov, 2013 CO 18, ¶ 16, 298 P.3d 228, 232.

### B.  "Custody" for <u>Miranda</u> Purposes

¶19 A person subjected to custodial interrogation by a law enforcement officer is afforded certain procedural protections designed to safeguard rights guaranteed by the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The state may not introduce in its

---

2. We find that the People have met the threshold requirements of C.A.R. 4.1(a) to bring this interlocutory appeal. See C.A.R. 4.1(a) (permitting the People to file an interlocutory appeal in this court from a district court's ruling that granted a motion to suppress evidence provided that the People certify that the appeal is not taken for purposes of delay and that the evidence is a substantial part of the proof of the charge pending against the defendant).

case-in-chief statements made by a defendant during custodial police interrogation unless the state establishes that the defendant was advised of certain constitutional rights and waived those rights. Id. at 444-45, 86 S.Ct. 1602; see also People v. Minjarez, 81 P.3d 348, 352 (Colo. 2003). To receive the Miranda protections under the Fifth Amendment a person must both be in custody for Miranda purposes and be subjected to police interro-. gation. People v. Breidenbach, 875 P.2d 879, 885 (Colo. 1994).

¶20 A person is in custody for Miranda purposes if she has been formally arrested or if, under the totality of the circumstances, a reasonable person in the suspect's position would have felt that her freedom of action had been curtailed to a degree associated with formal arrest. People v. Mangum, 48 P.3d 568, 571 (Colo. 2002). To assist courts in this analysis, we have outlined a non-exclusive list of factors to consider when conducting a Miranda custody determination:

(1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

People v. Matheny, 46 P.3d 453, 465-66 (Colo. 2002) (citation omitted). No single factor is determinative, and the court is not limited in the number of factors it may consider. Minjarez, 81 P.3d at 353.

¶21 As the first Matheny factor indicates, the location of the encounter is significant. When the interaction occurs at the person's home or at a familiar location, it weighs against a finding of custody. See, e.g., Beckwith v. United States, 425 U.S. 341, 342-43, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (holding the defendant was not in custody when the defendant spoke with an Internal Reve-

nue Service agent in a private home where the defendant occasionally stayed); People v. Cowart, 244 P.3d 1199, 1204-05 (Colo. 2010) (describing how the conversation occurred in the "neutral location" of the defendant's living room); cf. Oregon v. Elstad, 470 U.S. 298, 315, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ("Neither the environment nor the manner of either 'interrogation' was coercive. The initial conversation took place at midday, in the living room area of respondent's own home...."). We have also recognized that the area just outside a familiar residence can be a neutral location. For example, in Mumford v. People, we described the curb directly in front of the defendant's home as a "neutral area." 2012 CO 2, ¶ 19, 270 P.3d 953, 958. Similarly, in People v. Klinck, we noted the location of the encounter—the front porch of the defendant's girlfriend's house—did not support a finding of custody because he was in "a familiar location." 259 P.3d 489, 494 (Colo. 2011); see also People v. Howard, 92 P.3d 445, 451-52 (Colo. 2004) (listing the place of the encounter—the driveway of the defendant's home—as a reason he was not in custody).

¶22 Location matters not only because it can affect a suspect's peace of mind, and thus her ability to withstand psychological compulsion, but also where a conversation occurs in public, "the public nature ... offsets the 'aura of authority surrounding an armed, uniformed officer.'" Sampson, ¶ 30, 404 P.3d at 278-79 (quoting Berkemer v. McCarty, 468 U.S. 420, 438, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

¶23 A suspect's emotional state at the time of questioning may also reveal much about that individual's ability to withstand psychological compulsion. A calm emotional state suggests a person does not feel the pressures associated with custody. Compare Klinck, 259 P.3d at 494-95 ("[The defendant] was calm, did not appear to be emotionally distraught, and did not request termination of the interview. Ultimately, the general atmosphere and tone of the interview did not evince any attempt by the police to subjugate [the defendant] to the will of his examiner." (citation omitted)), with Effland v. People, 240 P.3d 868, 875 (Colo. 2010) (listing the fact that the

suspect "was emotionally distraught and was crying throughout the interrogation" as a factor in favor of a finding of custody), and Minjarez, 81 P.3d at 356 (describing that the defendant was emotionally distraught throughout the interview, which contributed to the confrontational and accusatory mood of the interview).

¶24 With this precedent in mind, we now turn to the facts at hand.

### C. Application

¶25 Garcia spoke with several officers. Inside the house, she spoke briefly with Officers Thomas, Smith, Lauck, and Spresser. Outside the house, she spoke separately with Officers Smith and Thomas. We will first consider the exchanges that occurred inside the house, and then examine those that occurred outside.

#### 1. Inside the House

¶26 According to the officers' uncontested testimony at the motions hearing, Garcia made the following statements inside the house: (1) Garcia told Officer Thomas no one else was home; (2) Garcia told Officer Smith no one else was home and then said her brother was home; (3) Garcia gave Officer Lauck permission to search upstairs; and (4) Garcia told Officer Spresser the padlock was intended to keep her brother from eating the food in the refrigerator.

¶27 Applying the Matheny factors here, several weigh against a finding of custody. First, the time, place, and purpose of the encounter suggest no custody. The conversations occurred in the afternoon at Garcia's home, a neutral location. The police came to the door to conduct a welfare check on a child. They entered the home to help the mother.

¶28 Moreover, the encounter inside the house was brief and conversational. Garcia interacted with the officers separately. The officers asked general investigatory questions focused on safety, rather than trying to force inculpatory statements from Garcia.

The officers gave Garcia no directions, nor did they restrain her. Garcia did not appear emotionally distraught.

¶29 Some facts cut the other way. The officers entered Garcia's home without permission [3] and conducted a sweep of the house with their guns brandished at "low ready." The trial court found this created an "inherently coercive environment." And there were many law enforcement officers and other government officials inside the house.

¶30 But the presence of multiple officers, even displaying weapons, does not automatically yield custody. "[A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' " Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam); see People v. Horn, 790 P.2d 816, 818 (Colo. 1990) ("[T]he fact that an interview takes place at a police station or that the environment is perceived to be 'coercive' is not determinative of the custody issue."). In fact, other jurisdictions have concluded there was no custody for Miranda purposes even when the trial court explicitly found the atmosphere to be police-dominated. See, e.g., United States v. Matcovich, 522 Fed.Appx. 850, 852 (11th Cir. 2013) (concluding there was no custody even though "there was a 'police-dominated atmosphere' with a number of officers handcuffing residents and bringing them to a central location").

¶31 Instead, the relevant inquiry is the degree of governmental coercion directed at the suspect. See Minjarez, 81 P.3d at 352-53 ("The Miranda Court was particularly concerned about the threat to the privilege against self-incrimination posed by coercive interrogation techniques applied to individuals who are isolated and deprived of contact with friends and family." (emphasis added)). Indeed, in conducting the custody analysis in the past, we have distinguished between the

**3.** The trial court invoked the emergency aid exception to the warrant requirement, and that

decision is not at issue in this appeal.

number of officers generally present at a scene and the number of officers focused on the defendant. Pleshakov, ¶ 30, 298 P.3d at 235 (finding the defendant was not in custody for Miranda purposes when there were four officers present at the scene, but only one officer spoke with the defendant and the other officers were engaged in other tasks).

¶32 Here, there were many officers present, but not all of the officers focused on Garcia. Instead, only one officer at a time spoke to Garcia, while the other officers were occupied with the mother, the brother, and searching for the child.

¶33 In evaluating the totality of the circumstances here, we conclude that a reasonable person would not have felt Garcia's freedom of action had been curtailed to a degree associated with formal arrest when Garcia spoke with officers inside her house. See Mangum, 48 P.3d at 571. Accordingly, Garcia was not in custody inside her house.

## 2. Outside the House

¶34 The exchanges between Garcia and Officers Thomas and Smith in the front yard are a closer call, but still do not rise to the level of custody for Miranda purposes. Garcia spoke with Officer Thomas for "a few minutes," and Garcia told him that she was the caretaker of her mother. In a separate conversation lasting "five to seven minutes," Garcia told Officer Smith that she and her sister were the caretakers of her mother.

¶35 While the interactions in the front yard largely resembled those that occurred inside the house, there were several differences. Obviously, the location changed. And the trial court found that the police directed Garcia outside. A direction given by an officer to a suspect is a factor weighing in favor of a finding of custody. See Matheny, 46 P.3d at 466. While we accept the trial court's finding in this respect, we consider it in connection with the broader set of circumstances. The house was in an alarming state; eventually, a building inspector condemned the house, stating no one should be inside. Furthermore, the governmental response to the circumstances within the house made a desire to speak outside understandable. That

move also had the virtue of taking the defendant away from the larger number of public officials inside the house. And the front yard of a person's house is arguably an even more innocuous location both because it is familiar to the defendant and open to the public.

¶36 Garcia's "indifferent" reaction also suggests she was not succumbing to any allegedly coercive police influences. See id. at 466 (listing "the defendant's verbal or nonverbal response to such directions" as a factor for courts to consider in the Miranda custody determination). Officer Thomas asked Garcia to stop using her phone when he spoke with her outside. She ignored him and kept using her phone anyway. Officer Smith testified he raised his voice when speaking with Garcia in the front yard. He said, "Come on, seriously?" and "Look, just tell me what's going on here. It's obvious this situation isn't good." Aside from stating she and her sister were the caretakers of the mother, Garcia continued to deny knowing what was going on. If wearing her down was the goal, she wasn't having it.

¶37 While some of these circumstances outside the house may suggest custody, the totality does not. Notably, Garcia was never physically restrained and the officers made no threats, promises, or even references to criminal liability. The interactions outside were slightly longer than the initial, verybrief contacts inside the house, but the total length of each interaction was still short, each lasting less than seven minutes. Compare Minjarez, 81 P.3d at 356 (finding custody for Miranda purposes where the defendant was questioned for forty-five minutes), with Klinck, 259 P.3d at 491, 494-95 (finding no custody for a conversation on the porch where the conversation lasted five to ten minutes). Garcia was in a neutral location; the conversations occurred in the afternoon; she was not visibly upset; and her demeanor in reaction to any orders she may have received from officers was "indifferent."

¶38 Under the totality of the circumstances, a reasonable person in Garcia's position during the contacts in the yard would not have felt that her freedom of action had been curtailed to a degree associated with formal arrest.

### III. Conclusion

¶39 Accordingly, we conclude Garcia was not in custody at any point when she spoke with officers either inside her house or outside her house. Thus, the protections of Miranda were not implicated. Therefore, we reverse the trial court's order suppressing Garcia's statements.