18CA1952 Peo v Peterson 01-27-2022 COLORADO COURT OF APPEALS Court of Appeals No. 18CA1952 Mesa County District Court No. 17CR889 Honorable Valerie J. Robison, Judge Honorable Richard T. Gurley, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Jeremy Peterson, Defendant-Appellant. JUDGMENT AFFIRMED Division IV Opinion by JUDGE RICHMAN Tow and Grove, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced January 27, 2022 Philip J. Weiser, Attorney General, Jillian J. Price, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Megan A. Ring, Colorado State Public Defender, Tracy C. Renner, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant 
1 ¶ 1 Defendant, Jeremy Peterson, appeals the judgment of conviction entered on a jury verdict finding him guilty of multiple counts of aggravated incest, sexual assault on a child, and sexual exploitation of a child. We affirm the judgment. I. Background ¶ 2 When she was fourteen years old, A.P. told a trusted friend that Peterson, who is her father, had been engaging in sexual activities with her for as long as she could remember. Her friend’s mother called the police. A.P. and her mother, who is deaf, were interviewed by the police at the police station that evening. ¶ 3 A.P. confirmed to Detective Mark Post that Peterson had often made her do one or more acts on a list of “five sexual things” to gain his permission for her to leave the house. While the interview was in progress, Peterson, who is also deaf, used a telephone relay service to call the police department and inquire what was happening with his wife and child. Post told Peterson that the police would be coming to the family’s apartment that night and they wanted to speak to him. ¶ 4 Around 3:00 in the morning, Peterson’s wife accompanied police to the apartment and let them in. In addition to Post and an 
2 agent from child protective services, three other officers (including one in uniform) were present. Peterson was asleep on the sofa. His wife woke him up and, using sign language, explained why the group was there.1 Post began communicating with Peterson using a notepad and pen. As relevant here, the following written exchange took place as Peterson sat on the sofa and Post stood in front of him: Post: My name is Detective Post. I’m sorry we don’t sign and we will try to hurry. Can I ask you a few questions[?] Peterson: Ok but not [without] lawyer and certified interpreter. Sorry. Its State/Federal law requires for it [sic]. Post: We are here involving allegations involving [A.P.]. We are not here to violate your [r]ights. We would like to discuss this at a later time if you are willing. We will investigate this as quickly as we can. [W]e hope for your [and mother’s] cooperation. [W]e will work as quick as we can. For safety reasons[,] we need to place your children into monitored care. Peterson: Really? We are being cooperated [sic]. Ok I may have time for discussion just for less than 15 mins. 1 A.P. is the oldest of three children in the Peterson family. The two other children were in the apartment that morning. 
3 Post: Are you offering to make a statement? Peterson: OK Post: I am getting a form if you want to do a statement that I need you to read [and] unde[rstand]. THIS [w]ill NOT change the situation [with] your children. . . . Peterson: [T]here is no point to “monitored care[.]” You’ll have no proper procedure like get interpreter or lawyer. Post: We have tried for assistance with an interpreter and have not found one[.] [W]e have to go forward with this [because the] Department of human services has custody at this time . . . . [A.P.] has said you do sexual things to her. For those reasons[,] a safety plan has been enacted [f]or [a]ll the kids. Peterson: Instead of monitored care, take me instead? . . . Post: We are not arresting you. We have to look into this matter. Why should we take you? Peterson: Cuz we rather this baby stays. Post: Again that is not an option. ¶ 5 After this exchange, several witnesses testified that Peterson reviewed and signed a Miranda advisement form. However, at the time of the suppression hearing, the form could not be located and, therefore, it is not part of the record. 
4 ¶ 6 Once the children were removed from the apartment, the written exchange between Post and Peterson resumed: Post: I am sorry for all this. Do you remember the form you signed? Peterson: Yes Post: Are you willing to make a statement still? Peterson: OK Post: Tell me about what happens with [A.P.] . . . . Peterson: So basically, I made mistakes. I know I was wrong to do sexual thing/abuse. I was stupid, OK. . . . Is this off the record? Post: NO this is on reco[rd]. What happened with [A.P.]? ¶ 7 Peterson responded by describing multiple incidents of sexual contact with A.P. At 5:40 a.m., police placed Peterson under arrest. Of the approximately two hours and forty minutes that had passed since the group’s arrival, twenty to thirty minutes were spent gathering the children’s personal items and removing the children from the apartment. No interrogation occurred during that time. ¶ 8 The day after Peterson’s arrest, Post interviewed A.P. She told Post that Peterson took sexually explicit photos of her and saved them to a hidden file on a black hard drive in her brother’s room. 
5 Police secured a warrant to search the apartment. While executing the warrant, police seized several digital storage devices, including the hard drive. They also seized four handwritten paper notes. Their subsequent2 search of the hard drive revealed sexually explicit photos and videos of A.P. ¶ 9 Prior to trial, in separate motions, Peterson moved to suppress (1) his written exchange with Post, arguing that the statements contained therein were involuntary and procured in violation of the Fifth Amendment protections recognized in Miranda v. Arizona, 384 U.S. 436 (1966), and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134; (2) the four handwritten notes because they were not within the scope of the warrant or in plain view; and (3) as relevant here, items discovered during the search of the hard drive because the supporting warrants were overbroad. ¶ 10 Concluding that Peterson was not in custody, his statements were voluntarily made, and non-compliance with the ADA did not provide a legal basis for suppression, the trial court declined to 2 A warrant executed after the search of the hard drive authorized police to search “all files contained on any of the seized devices.” 
6 suppress the written statements. The court did grant suppression of one “handwritten letter” because it was not within the scope of the warrant, and the People did not demonstrate it was in plain view. The court did not address the other handwritten notes. It declined to suppress items revealed in the search of digital media, determining that the warrants were not overbroad because they “expressly identify the type of evidence to be searched” — child pornography. ¶ 11 On appeal, Peterson contends that the trial court reversibly erred insofar as it denied his motions to suppress. We address each type of evidentiary item in turn. II. Standard of Review ¶ 12 Motions to suppress raise mixed questions of fact and law. We defer to a trial court’s findings of fact so long as the record supports them, but we review its legal conclusions de novo. People v. Allen, 199 P.3d 33, 35 (Colo. App. 2007). We may also rely on facts that were not included in the trial court’s findings but are undisputed in the record. People v. Garcia, 2017 CO 106, ¶ 18. We consider only the record of the suppression hearing. People v. Thompson, 2021 CO 15, ¶ 16. 
7 III. Suppression of the Written Statements ¶ 13 We first address Peterson’s contention that his written statements were procured through violations of his Fifth Amendment privilege and his statutory rights as a person with a disability. A. The Fifth Amendment Privilege ¶ 14 The Fifth Amendment protects a criminal defendant’s right not to make compelled statements in which he serves as a witness against himself. U.S. Const. amends. V, XIV, § 1. To ensure that state actors respect this right when they question suspects, a court must suppress all statements made during custodial interrogation unless a criminal defendant has waived his Fifth Amendment privilege after being advised of his Miranda rights. People v. Hankins, 201 P.3d 1215, 1218 (Colo. 2009). But, the police are not required to give Miranda warnings to everyone they question. Id. Warnings need only be given to people whose freedom has been so restricted as to render them “in custody.” Id. (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). On the other hand, even absent custodial interrogation, only statements that are voluntarily made are admissible. People v. Coke, 2020 CO 28, ¶ 17. 
8 ¶ 15 Here, as in the trial court, Peterson asserts that he was in custody when Post interrogated him, and even if he was not, his statements were made involuntarily. B. Custody ¶ 16 “A person is in custody for Miranda purposes if [he] has been formally arrested or if, under the totality of the circumstances, a reasonable person in the suspect’s position would have felt that [his] freedom of action had been curtailed to a degree associated with formal arrest.” Garcia, ¶ 20. To aid courts in determining whether a defendant was in custody for Miranda purposes, the supreme court has outlined a non-exclusive list of material factors. They are: (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions. 
9 People v. Matheny, 46 P.3d 453, 465-66 (Colo. 2002) (citation omitted). No one factor is dispositive. Garcia, ¶ 20. ¶ 17 For several reasons, we conclude that Peterson was not in custody when Post interrogated him. ¶ 18 First, the time and place of the encounter were not coercive when viewed in light of the full record. Although officers arrived at 3 a.m. — a time when an individual might be caught by surprise and, thus, feel that his options were limited — Peterson himself initiated communication with the police and was told that they would be coming to talk to him. The trial court also found that Peterson’s wife “could and did freely communicate with [him] using sign language the entire time everyone was in the apartment,” and it is undisputed that she let the police into the apartment, a neutral location for questioning. Id. at ¶ 22. ¶ 19 Second, the purpose of the encounter was twofold: to remove the children from the home and to question Peterson. While the intent to question Peterson shows that police considered him a criminal suspect, an expectation of eventual arrest does not turn a non-custodial circumstance into a custodial one. Hankins, 201 P.3d at 1219 (noting that “expectation, apprehension, or knowledge 
10 of inevitable arrest are not the Miranda triggers; custody is”). And police were also there to address child welfare concerns, a neutral purpose. Garcia, ¶ 27 (determining that the defendant was not in custody because, among other factors, police were present to conduct a welfare check). ¶ 20 Third, the trial court found, with record support, that the written exchange between Post and Peterson was courteous and professional, the non-verbal conduct of the police was not aggressive or threatening, and the police did not direct Peterson to do anything except read the Miranda advisement. See Matheny, 46 P.3d at 467 (citing the “polite” and “reasonable” tone as a factor weighing against a finding of custody); see also People v. Clark, 2020 CO 36, ¶ 31 (noting that an officer’s conversational tone militated against the conclusion that the defendant was in custody). ¶ 21 In addition, the officers never threatened him, and made no promises other than that they would attempt to complete the investigation quickly. Post also informed Peterson that his agreement to speak with the police would not change the situation with the children. When he asked whether the exchange was “off the record,” Post told him that the conversation was “on record.” 
11 ¶ 22 Fourth, although some factors might appear to weigh in favor of the conclusion that Peterson was in custody, the potential coercive effect of these factors is mitigated by the context. At the time of questioning, four police officers stood near the defendant, including one officer who leaned against the front door. Although the number of officers standing near Peterson was large, the trial court found that the reason for the officers’ proximity was the tight layout of the apartment and the fact that it was packed with boxes due to a recent move. There is no evidence that the police hovered over Peterson in an attempt to prevent his escape. ¶ 23 Moreover, while there were four officers present, only one of them communicated with Peterson. Garcia, ¶¶ 30-31 (noting that courts have often distinguished between the number of officers present at the scene and the number of officers focused solely on the defendant); see also Clark, ¶ 33. True, as a safety precaution, one officer followed Peterson and his wife around the apartment while they gathered items for the children, but the undisputed testimony was that the officer did not draw his weapon or try to ask Peterson any questions or physically restrain him. 
12 ¶ 24 Fifth, according to the undisputed record, Peterson asked Post to “take [him] instead” of the children. Post responded, “We are not arresting you. We have to look into this matter.” Thus, Post indicated that the police were not prepared to arrest Peterson until they had additional information. Such an exchange would not give a reasonable person the impression that he was under arrest. People v. Sampson, 2017 CO 100, ¶ 29 (concluding the defendant was not in custody during questioning because an officer informed the defendant that he would be arrested at a later time); see also Clark, ¶ 32. ¶ 25 Finally, while acknowledging that the custody test is an objective one, our review of the totality of the circumstances requires that we consider Peterson’s deafness and the limitations his disability might have presented. See J.D.B. v. North Carolina, 564 U.S. 261, 278 (2011) (noting the state’s concession that a suspect’s personal characteristics — for example, blindness — may be relevant to the custody analysis and finding age to be a relevant factor in some circumstances). As Peterson has argued, and as a division of this court has recognized, deafness may severely impair a person’s ability to understand English. People v. James, 937 P.2d 
13 781, 783 (Colo. App. 1996). In fact, English is a second language for many deaf people. Aviva Twersky-Glasner, Miranda Warnings and Deaf Suspects: It is Not Just a Matter of Translation, 42 No. 5 Crim. Law Bulletin 4 (Fall 2006). Therefore, written communication may or may not be an effective means of communicating with a deaf person, depending on his level of English literacy. We recognize that an inability to communicate with officers might impair a person’s understanding that he is not under arrest. Id. ¶ 26 However, other than raising his status as a deaf person, Peterson presented no evidence that he had difficulties understanding written English. The trial court was able to examine the contents of his written communications with Post, as are we. Our review of the exchange reveals that Peterson understood English rather well. He responded appropriately to Post’s questions and answers, and he asked several clarifying questions. He never indicated that, despite Post’s clarifications, he could not understand what was happening. ¶ 27 Moreover, in cases involving defendants who spoke English as a second language, other divisions of this court have concluded that basic English skills are sufficient to effect a valid waiver of Miranda 
14 rights. See, e.g., People v. Delgado, 832 P.2d 971, 973 (Colo. App. 1991). We similarly conclude that any alleged linguistic deficits did not demonstrably prevent Peterson from comprehending the conversation he had with Post. ¶ 28 Peterson was not in custody when Post interrogated him. Therefore, further analysis of the sufficiency of the Miranda advisement, or the validity of the waiver, is unnecessary. C. Voluntariness ¶ 29 Peterson contends that his written statements were involuntary because Post ignored his request for a lawyer and interpreter, and he used the removal of the children to compel Peterson to answer questions. ¶ 30 When determining whether statements were involuntary, we consider the totality of the circumstances. Coke, ¶ 18. The analysis involves a two-step process. We first consider whether police conduct was coercive. Id. at ¶ 19; see Colorado v. Connelly, 479 U.S. 157, 167 (1986) (noting that “coercive police activity is a necessary predicate to the finding that a confession is not ‘voluntary’”). We then consider whether coercive police conduct played a significant role in inducing Peterson to make the 
15 challenged statements. If such conduct did not play a significant role, the statement will be considered voluntary. Coke, ¶¶ 19, 31. ¶ 31 When determining whether police conduct was coercive, courts should evaluate (1) whether the defendant was in custody; (2) whether the defendant was free to leave; (3) whether the defendant was aware of the situation; (4) whether the police read Miranda rights to the defendant; (5) whether the defendant understood and waived Miranda rights; (6) whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation; (7) whether the statement was made during the interrogation or volunteered later; (8) whether the police threatened [the] defendant or promised anything directly or impliedly; (9) the method of the interrogation; (10) the defendant’s mental and physical condition just prior to the interrogation; (11) the length of the interrogation; (12) the location of the interrogation; and (13) the physical conditions of the location where the interrogation occurred. Id. at ¶ 20 (citation omitted). Courts may also consider other factors, bearing in mind that physical abuse is not necessary to support a finding of coercion. A statement is not voluntary if it is extracted by threats or improper influence or is the product of direct or implied promises to the defendant. People v. Gennings, 
16 808 P.2d 839, 843 (Colo. 1991); People v. Marston, 2021 COA 14, ¶ 13. ¶ 32 Based on the totality of the circumstances, we agree with the trial court’s conclusion that Peterson’s statements were voluntary. ¶ 33 As noted above, Peterson was not in custody and he was in a neutral location when Post interrogated him. Although he was given a Miranda advisement form and he read and signed it,3 the trial court made no finding regarding whether he understood the contents of the form. We therefore do not proceed under the premise that the advisement form functioned as a full advisement of rights. ¶ 34 Even so, the fact that the police gave Peterson the advisement form militates against the conclusion that they acted in a coercive manner. At a minimum, it shows that the police attempted to ensure Peterson understood he had certain rights. Peterson’s wife 3 The fact that Post chose to give Peterson an advisement form does not undercut our conclusion that he was not in custody. An advisement alone does not preclude a finding that a defendant was not in custody based on the totality of the circumstances. People v. Sampson, 2017 CO 100, ¶ 31 (noting that although the defendant was given an advisement, he was not in custody). 
17 testified that he told her the advisement form concerned his “confidentiality rights.” Thus, he knew that the police gave him a form to explain his rights. ¶ 35 Peterson asserts that the police, nonetheless, attempted to coerce him by pairing information about removal of the children with a request to ask him questions. The record belies this assertion. Post made no promises or threats related to the children. In fact, he told Peterson that his decision to answer questions would not change that situation. We are not persuaded that Post used the children’s removal to induce Peterson’s statement. ¶ 36 We are similarly unpersuaded by Peterson’s contention that police coerced him to speak by failing to provide an interpreter or an attorney. While Peterson initially asked for an attorney and an interpreter, he was not in custody at the time and no clear precedent mandated that Post stop interrogating him. See United States v. Bautista, 145 F.3d 1140, 1147 (10th Cir. 1998); see also People v. Trujillo, 773 P.2d 1086, 1092 (Colo. 1989) (holding that the release of a defendant who has previously invoked his right to counsel while in police custody terminates the constraint that interrogation must cease until an attorney is present because “the 
18 defendant is no longer under the inherently compelling pressures of continuous custody”). Despite that fact, Post told Peterson in response to his request for an attorney, “We would like to discuss this at a later time if you are willing.” It was Peterson who then volunteered to give a statement, impliedly without an attorney or interpreter, while police were at the apartment. ¶ 37 Further, although the interrogation was rather long — at least two hours — it was conducted entirely in writing, a form of communication that is not terribly efficient. Given the consistently polite tenor of the extended written exchange, we are not convinced that this factor, alone, demonstrates police coercion. ¶ 38 For these reasons, we conclude that Peterson’s written statements were voluntary, and the trial court properly declined to suppress them. D. Statutory Law ¶ 39 Peterson argued in the trial court that the failure to provide an interpreter violated the ADA,4 requiring suppression of his 4 Peterson does not specify which section of the ADA he relies on. However, based on the language quoted in the opening brief, it appears he relies on 42 U.S.C. §§ 12112(b)(5)(A),12131-12132. 
19 statements. On appeal, he also argues that the failure to provide an interpreter violated section 13-90-204(1)(d), C.R.S. 2021. ¶ 40 In support of his assertion that a violation of the ADA may trigger suppression of evidence, Peterson cites only one case, Seremeth v. Bd. of Cnty. Comm’rs, 673 F.3d 333 (4th Cir. 2012). He asserts that in Seremeth, “the Fourth Circuit has held that police investigations are subject to the ADA’s framework.” Seremith does so hold. Id. at 338-39. However, Seremith is a civil case and the opinion does not address whether violation of the ADA may support suppression of evidence in a criminal case. ¶ 41 Even if we assume police conduct violated the ADA, it is not clear that an ADA violation triggers suppression of evidence in the criminal context. Nathan v. Municipality of Anchorage, 955 P.2d 528, 532-33 (Alaska. 1998) (concluding that a violation of the ADA did not trigger the exclusionary rule because it did not necessarily impair a deaf defendant’s ability to exercise his constitutional rights); State v. Piddington, 607 N.W.2d 303, 309-10 (Wis. Ct. App. 2000) (same). Peterson makes no attempt to explain why a violation of the ADA supports such a remedy. We do not address skeletal 
20 arguments and decline to do so here. People v. Leverton, 2017 COA 34, ¶ 65. ¶ 42 Similarly, although section 13-90-204(1)(d) requires “[a]n appointing authority” to “provide a qualified auxiliary services provider to interpret” proceedings “[w]hen a person who is deaf, hard of hearing, or deafblind is arrested and taken into custody,” Peterson was not in custody during the relevant time period. He makes no argument that section 13-90-204(1)(d) applies outside the custodial context. Given the lack of substantive argument, we decline to address the implications of this statute. Leverton, ¶ 65. IV. Suppression of the Notes ¶ 43 We next address Peterson’s contention that the trial court should have suppressed two more of the four handwritten notes seized in the initial search. Although these notes were admitted at the suppression hearing upon the People’s motion, defense counsel did not make any arguments specific to them and the trial court did not address them in its suppression order. ¶ 44 At trial, A.P. testified to multiple incidents of sexual abuse. As relevant here, she testified that, during one incident, Peterson came to her room and wanted her to do “[the] five [sexual things].” She 
21 pretended to go to sleep. The next morning, he made her pick one of the five acts and do it. After this testimony, the People showed A.P. the first handwritten note. It said, “[A.P], Wake me up when you wake up please. The promise! Thx Daddy.” The note was admitted without objection. A.P. testified that “this note was during the incident when I had pretended to go to sleep. He made me promise to do one of the five things . . . he had wrote this note telling me to wake him up when I got up.” ¶ 45 The People next showed A.P. the second note, which said, “Mom, I’m just outside. I’ll keep check[ing] in every hour. B[y the way], dad said okay for me to go outside + play[.] [Heart] u, [A.P.]” She testified that she wrote the second note when she “had wanted to go han[g] out with my friends outside so I’d asked my dad for permission and he told me that if I wanted to go outside . . . I had to do one of the five things with him.” The note was admitted over foundation and relevance objections. ¶ 46 The next day, defense counsel raised a concern that while the two notes were given to him in discovery, “the explanations that were elicited from the witness about how those notes corresponded to specific sexual acts is found nowhere in discovery.” Counsel 
22 asserted “some sort of violation here of discovery and Mr. Peterson’s due process” and “if the significance of these notes had been anywhere in discovery . . . I would have moved to suppress those two notes . . . because they were found in the same manner as the [suppressed letter].” Counsel later clarified, “My request i[s] that the Court find that there is a Rule 16 violation because the Prosecution specifically elicited a statement from a witness that was not disclosed.” The court denied the request. ¶ 47 Peterson now argues that, upon learning that the notes were found in the same manner as the suppressed letter, the trial court had an obligation to construe counsel’s Crim. P. 16 motion as a Crim. P. 41(e) motion to suppress. A. Law ¶ 48 A Rule 41(e) motion to suppress is a claim that a defendant’s Fourth Amendment rights were violated. People v. Cunningham, 2013 CO 71, ¶ 10. By contrast, a Rule 16 motion to exclude is a claim that the court should order sanctions because materials were not disclosed in violation of a rule of criminal procedure. See Crim. P. 16(III)(g). Thus, when a party makes a motion under Rule 16, he is not necessarily raising a constitutional claim. 
23 ¶ 49 Further, a Rule 41(e) motion “shall be made and heard before trial unless an opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court, in its discretion, may entertain the motion at the trial.” Crim. P. 41(e). Thus, trial courts have discretion to entertain midtrial motions to suppress, but they may deny late-filed motions if the grounds cited were known or “reasonably discernible” before trial. People v. Tyler, 874 P.2d 1037, 1039 (Colo. 1994). “Ordinarily, a trial court is not required to entertain a suppression motion at trial.” People v. Cornelius, 41 Colo. App. 182, 186, 585 P.2d 295, 298 (1978). B. Analysis ¶ 50 Peterson has not cited, and we have not found, any case standing for the proposition that when “due process” is mentioned, a trial court must convert a procedural motion to a constitutional one. Because the legal grounds for these motions are different and defense counsel’s arguments focused only on discovery issues, we cannot fault the trial court for failing to divine Peterson’s Fourth Amendment argument from his brief mention of “due process.” In addition, even if the court had perceived that Peterson was 
24 impliedly proceeding under Rule 41(e), he does not explain why the court was required to hear his late-filed motion. ¶ 51 Thus, we conclude that counsel failed to preserve the argument that admission of the notes violated Peterson’s Fourth Amendment rights or that the court was required to hear a midtrial Rule 41(e) motion. People v. Tallent, 2021 CO 68, ¶ 12 (“To preserve a claim, a party must make an objection ‘specific enough to draw the trial court’s attention to the asserted error.’”) (citation omitted). We review only for plain error. Id. An error is plain when it is obvious, and it “so undermines the fundamental fairness of the trial itself as to cast serious doubt on reliability of the judgment of conviction.” Id. at ¶ 20 (citing Crim. P. 52(b)); see also Hagos v. People, 2012 CO 63, ¶ 14. ¶ 52 Any error was not obvious. Peterson made no substantive argument based on the Fourth Amendment. Further, the notes were of ancillary importance in the trial. They supported A.P.’s testimony that one particular incident had occurred and her general assertion that she was made to trade sexual favors for childhood privileges. This testimony was detailed and compelling on its own, and although relevant, the notes did not substantially add to the 
25 explicit evidence presented. Therefore, the reliability of the judgment of conviction is not in doubt. If the trial court erred by failing to suppress the notes, the error was not plain. V. Suppression of Digital Materials ¶ 53 We next address Peterson’s argument that the trial court should have suppressed photos and videos of A.P. found on the hard drive because the supporting warrant was overbroad. ¶ 54 The search of the hard drive was supported by a warrant that authorized the seizure of: [A]ll hard drives, computers, laptops, tablets, Apple devices, android devices, external media storage devices, smartphones, flash drives, and any other device which might store digital files and media; any visual depiction of minor(s) engaged in sexually explicit conduct or child erotica in any format or media including, but not limited to, photographs, magazines, photocopies or photographs, videocassette tapes, photographic and motion picture film, and computer images. It further authorized police to acquire and examine “all files contained on any of the seized devices.” A. Law ¶ 55 When police conduct a search pursuant to a warrant, it is generally deemed “reasonable” and therefore compliant with the 
26 Fourth Amendment. Thompson, ¶ 18. However, the Fourth Amendment requires that warrants “particularly describ[e] the place to be searched, and the persons or things to be seized.” Id. at ¶ 17 (quoting U.S. Const. amend. IV). General exploratory searches are not permitted. Id. at ¶ 18. ¶ 56 A general search is one in which the warrant permits officers to conduct a “general, exploratory rummaging in a person’s belongings.” People v. Herrera, 2015 CO 60, ¶ 19 (quoting People v. Roccaforte, 919 P.2d 799, 802 (Colo. 1996)). By contrast, a warrant is sufficiently particular if it “enables the executing officer to reasonably ascertain and identify the things authorized to be seized.” Roccaforte, 919 P.2d at 803. What makes a warrant sufficiently particular varies according to the information available to the police and the type of items to be seized. People v. Hearty, 644 P.2d 302, 312 (Colo. 1982). Searches of computers must be limited to evidence of specific crimes or types of material. United States v. Riccardi, 405 F.3d 852, 862 (10th Cir. 2005). ¶ 57 An affidavit can cure an overbroad warrant if the warrant incorporates the affidavit by reference, both documents are presented to the issuing magistrate or judge, and the curative 
27 affidavit accompanies the warrant during its execution or the warrant is executed by the affiant. Roccaforte, 919 P.2d at 803; People v. Staton, 924 P.2d 127, 132 (Colo. 1996). The parties do not appear to dispute that all three of these criteria are met in this case. B. Analysis ¶ 58 In the warrant at issue here, the description of which devices could be seized was undoubtedly broad. It included any “device which might store digital files and media.” The trial court construed this broad description as limited by the subsequent description of the type of items sought. They included “any visual depiction of minor(s) engaged in sexually explicit conduct or child erotica in any format or media.” In other words, child pornography. ¶ 59 This reading of the warrant is buttressed by the affidavit, which stated that (1) Peterson had shown A.P. pornography; (2) asked her to do some of the things shown; (3) used his laptop to take pictures of A.P. complying; and (4) stored the images on a hard drive. It further stated that Peterson had told Post he started engaging in sexual contact with A.P. when she was approximately six years old. Based on these and other allegations, the affidavit asserted there was probable cause to believe that between June 
28 2009 and May 2017, the crime of sexual exploitation of a child had been committed. ¶ 60 When read together, we conclude that the warrant and affidavit were limited to the search and seizure of items created during a certain time period and to a certain type of evidence — child pornography. The broad scope of the warrant was necessitated in part by the information available to police, who had reason to believe that Peterson’s criminal conduct spanned nearly eight years, and that he had stored multiple images of child pornography on one or more digital devices. Under these circumstances, the affidavit cured any potential deficiencies and we conclude that the warrant was not overbroad. ¶ 61 Peterson insists that we should rely on case law addressing the scope of permissible cell phone searches. See Riley v. California, 573 U.S. 373, 401 (2014); Coke, ¶ 37; Herrera, ¶ 1. These cases may be distinguishable as a class because Colorado case law has recognized that, given a cell phone’s unique portability and functionality, cell phone searches raise special privacy concerns under the Fourth Amendment. Thompson, ¶ 19. 
29 ¶ 62 Even so, they are also distinguishable on their facts. Riley concerned the permissible scope of warrantless cell phone searches. 573 U.S. at 401. Here, police had a warrant. In Coke, a warrant was deemed insufficiently particular because it did not specify an alleged victim or time period, and it authorized the search of multiple types of data and databases, including phone records, contact lists, and all data constituting evidence of ownership or possession. Coke, ¶ 38. Here, the affidavit defined the relevant time period and the warrant only authorized a search for child pornography. Similarly, Herrera prohibits the general search of cell phones for all “indicia of ownership.” Herrera, ¶ 4. In this case, the People did not rely on a such a broad and amorphous justification. Rather, they had specific information that Peterson possessed child pornography and they sought authorization to search for that kind of evidence. ¶ 63 Accordingly, we conclude that the warrant did not violate the Fourth Amendment’s particularity requirement. VI. Conclusion ¶ 64 We affirm the judgment. JUDGE TOW and JUDGE GROVE concur.