The PEOPLE of the State of Colorado,
Plaintiff–Appellant

v.

Wayne Michael KLINCK, Jr.,
Defendant–Appellee.

No. 10SA361.

Supreme Court of Colorado,
En Banc.

May 31, 2011.

Carol Chambers, District Attorney, Eighteenth Judicial District, John Topolnicki, Deputy District Attorney, Centennial, Colorado, Attorneys for Plaintiff–Appellant.

Springer and Steinberg, P.C., Harvey A. Steinberg, Michael P. Zwiebel, Denver, Colorado, Attorneys for Defendant–Appellee.

Justice HOBBS delivered the Opinion of the Court.

In this interlocutory appeal, the prosecution challenges the trial court's suppression of statements made by the defendant, Wayne Klinck, while being questioned in connection with an assault on Klinck's girlfriend, D.B. Responding to a domestic disturbance report, police officers arrived at D.B.'s house and asked Klinck to remain on the porch while the officers interviewed D.B. Shortly thereafter, an officer spoke with Klinck and, when

the officer determined he had probable cause, placed Klinck under arrest.

Klinck was advised of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and invoked his right to counsel. When detectives later re-contacted and interviewed Klinck in jail, he waived his *Miranda* rights and provided additional information. The trial court suppressed the statements made by Klinck on the porch prior to his formal arrest, finding that Klinck was in custody during the initial interview for *Miranda* purposes and his statements were involuntary. The trial court also suppressed the statements made by Klinck after his arrest, finding them involuntary and in violation of *Miranda.*

Klinck acknowledges his statements on the porch were voluntary, and the prosecution concedes Klinck's statements in jail were properly suppressed as in violation of *Miranda* because Klinck had invoked the right to counsel yet the police continued to interrogate him. Before us is the issue of whether the trial court properly suppressed Klinck's porch statements, and whether his post-arrest statements were voluntary and may be used for purposes of impeachment.

We hold that Klinck was not in custody for *Miranda* purposes during his initial interview on the porch. The trial court erred in suppressing those statements. We find that Klinck's post-arrest interview statements were made voluntarily, and despite their suppression from the prosecution's case-in-chief they are admissible at trial for impeachment purposes.

## I.

On November 15, 2009, Douglas County Sheriff's Deputy Hays arrived at the home of the victim, D.B., in response to a domestic disturbance report. En route to the house, he learned from dispatch that D.B. was involved in an altercation with her boyfriend, Klinck, who had just left the house and would return shortly. As Deputy Hays approached D.B.'s house on foot, he observed a truck pull into the driveway of the house and a man exit the vehicle.

Deputy Hays followed the man into the open garage and asked him for identification. After identifying the man as Klinck, Deputy Hays asked what he was doing at the house. Klinck responded he was returning to his girlfriend's house after getting coffee. Klinck stated that, although he and D.B. had a "spat" the night before, he had no idea why the police were at the house. Deputy Hays asked to follow Klinck into the home. As they entered, he saw D.B. exit the front door and walk towards the back-up patrol car, which had pulled up in front of the house.

Klinck motioned to follow D.B. to the street, but Deputy Hays told Klinck to remain on the porch and he would be back to talk with him. Deputy Hays questioned D.B. in the patrol car for ten to fifteen minutes, during which time he learned that D.B. and Klinck had a fight the night before. D.B. said Klinck had come over to her house late at night, and she had woken up with him on top of her holding her down in bed by her wrists. She said Klinck at one point had put a pillow over her head and pushed her face into the mattress. Deputy Hays observed several red marks on D.B.'s wrists, as well as several red marks on her neck and right shoulder blade.

After speaking with D.B., Deputy Hays returned to the front porch to interview Klinck. The conversation lasted five to ten minutes. Deputy Hays maintained a conversational tone and did not touch Klinck or motion toward his weapon. Klinck reiterated he and D.B. had a "spat" the night before regarding alcohol, but, other than arguing, nothing occurred. Deputy Hays arrested Klinck on the basis of the physical evidence on D.B.'s person, which was consistent with her story.

At the jail, Deputy Hays informed Klinck, based upon D.B.'s statements, that Klinck would be charged with attempted murder, sexual assault, and burglary. Klinck responded that their sex was consensual and D.B. was trying to set him up because she thought he was cheating on her. Hays then advised Klinck of his *Miranda* rights, and Klinck responded, "I want to talk to my lawyer."

Several hours later, Detectives Aragon and Stewart contacted Klinck and brought him into an interrogation room for questioning. Although Klinck had previously asserted his right to counsel, neither detective was aware of this fact. They read Klinck his *Miranda* rights.

Klinck waived his rights and spoke with the detectives for over five hours. The entire interaction was captured on video inside the police interrogation room. The detectives maintained a conversational tone, asked open-ended questions, and were courteous and relaxed in their interactions with Klinck. Klinck appeared lucid, awake, and provided narrative answers. Klinck was not handcuffed during the interview, and the detectives offered Klinck water at multiple occasions.

Almost two hours into the interview, Klinck stated "I think I've been talking too long and I'm very tired." Detective Aragon replied, "Can we just talk about a couple of more things? If you don't want to talk about it we can't make you talk about it." Detectives were non-confrontational and emphasized that they wanted to hear "his side of the story," as they has previously spoken with D.B. in the hospital and desired to understand the events of the night from Klinck's perspective. Detective Aragon told Klinck that "it's up to me to decide if I'm gonna file charges and if so what charges I'm gonna file. And that makes my job really difficult if I only have one side of the story." Klinck proceeded to describe the facts of the night in question, but denied harming D.B.

After three and a half hours, Detective Aragon told Klinck that she appreciated him talking to them, and, while she believed much of what he said to be accurate, based on medical examinations of D.B., she knew some of what he told them to be inaccurate. In particular, Detective Aragon mentioned bruising around D.B.'s neck. Detective Aragon said this was Klinck's time to "accept responsibility for what happened," and the best thing to do would be to come clean. Klinck eventually admitted to using a pillow to cover D.B.'s face and briefly wrapping his hands around D.B.'s neck. While Klinck became emotional and tearful at one point, he did not ask for the interrogation to stop. He declined the detective's requests to search his cell phone and declined to write a letter to D.B. asking forgiveness, telling the detectives he didn't want those items to be used as evidence against him.

The prosecution charged Klinck with criminal attempt—murder in the first degree;[1] first degree burglary;[2] sexual assault with force;[3] second degree burglary;[4] assault in the third degree;[5] obstruction of telephone service;[6] false imprisonment;[7] and harassment,[8] all as acts of domestic violence.

The trial court suppressed Klinck's statements to Deputy Hays on the porch because Deputy Hays intended to arrest Klinck once he spoke with D.B. The court concluded on this basis that Klinck's statements should have been preceded by a *Miranda* warning and were involuntary. Klinck concedes the trial court erred in finding the statements taken by Deputy Hays on the porch involuntary.

■ The trial court suppressed Klinck's statements during his five hour jailhouse interview with the detectives for being involuntary and in violation of *Miranda*. Klinck requested counsel yet the interrogation proceeded. If a defendant makes an unequivocal request for counsel, as Klinck did, that request must be fully honored and no further questioning can occur until either a lawyer is provided for the accused or the accused voluntarily reinitiates the questioning. *People v. Redgebol*, 184 P.3d 86, 99 (Colo.2008). The prosecution concedes a *Miranda* violation.

1. §§ 18–2–101(1), 18–3–102(1)(a), C.R.S. (2010).

2. § 18–4–202(1), C.R.S. (2010).

3. § 18–3–402(1)(a)(4), C.R.S. (2010).

4. § 18–4–203(1), (2)(a), C.R.S. (2010).

5. § 18–3–204(1)(a), C.R.S. (2010).

6. § 18–9–306.5(1), C.R.S. (2010).

7. § 18–3–303, C.R.S. (2010).

8. § 18–9–111(1)(a), C.R.S. (2010).

As a result of the parties' concessions, there are two issues before us: (1) whether Klinck was in custody at the time he spoke to Deputy Hays on the porch of D.B.'s home, and (2) whether the five hour interview was involuntary.

## II.

We reverse. We hold that Klinck was not in custody for *Miranda* purposes during his initial interview on the porch. The trial court erred in suppressing those statements. We find that Klinck's post-arrest interview statements were made voluntarily, and despite their suppression from the prosecution's case-in-chief they are admissible at trial for impeachment purposes.

### A. Standard of Review

 Whether an individual has been subjected to custodial interrogation in violation of *Miranda* is a question of law that we review de novo. *People v. Matheny*, 46 P.3d 453, 462 (Colo.2002). Whether a statement is voluntary is evaluated on the basis of the totality of the circumstances under which it is given; the ultimate determination of whether a statement is voluntary is a legal question that we review de novo. *Effland v. People*, 240 P.3d 868, 877–78 (Colo.2010). The prosecution bears the burden of establishing the voluntariness of a defendant's statement by a preponderance of the evidence. *Id.; People v. Raffaelli*, 647 P.2d 230, 235 (Colo.1982).

### B. *Miranda*

 To protect a suspect's Fifth Amendment right against self-incrimination, *Miranda* prohibits the prosecution from introducing any statement procured by custodial interrogation unless the police precede their questions with certain warnings. 384 U.S. at 444, 86 S.Ct. 1602. Neither party disputes that the police questioned Klinck on D.B.'s front porch; the only issue is whether or not he was in police custody at the time.

 In determining whether a suspect has been subjected to custodial interrogation, the relevant inquiry is "whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *Effland*, 240 P.3d at 874 (quoting *Matheny*, 46 P.3d at 467). An officer's unarticulated plan has no bearing on the question of whether a suspect was in "custody" at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. *Stansbury v. California*, 511 U.S. 318, 323–24, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Matheny*, 46 P.3d at 465. We examine the circumstances surrounding the interrogation and evaluate whether, given those circumstances, a reasonable person would have felt he or she was at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

 In the custody inquiry we analyze the totality of the circumstances, including (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions. *Matheny*, 46 P.3d at 465–66. No single factor is determinative. *Id.*

In *Effland*, we held that the defendant was in custody at the time two plainclothes detectives interrogated him in his hospital room. 240 P.3d at 875–76. The defendant was confined to the hospital for medical reasons and was connected to an intravenous line. *Id.* During the interrogation, the defendant repeatedly informed the investigating officers that he did not wish to speak with them and desired to consult an attorney. The investigating officers told the defendant he was not entitled to an attorney, and the defendant was emotionally distraught and cried throughout the interview. *Id.* at 875. The officers sat in very close proximity to the

defendant and a uniformed police officer was stationed outside his hospital room. *Id.* While the police conducted the interrogation in a conversational tone and the defendant's mobility was limited for medical reasons unrelated to police conduct, we determined that a reasonable person would not feel free to terminate the communication and leave. *Id.*

In *People v. Minjarez,* we ruled that custodial interrogation occurred when the police questioned the defendant in a private conference room at a hospital where the defendant's daughter was receiving treatment. 81 P.3d 348, 350 (Colo.2003). That questioning occurred in a small room, the door was closed, police officers separated the defendant from the door, and the interrogation proceeded in a "highly confrontational and accusatory atmosphere." *Id.*

In contrast, in *People v. Cowart* we did not find a defendant in custody when the questioning occurred in the defendant's home and in the presence of his wife, the defendant was not physically restrained, and the tone and manner of the interrogation was non-confrontational. 244 P.3d 1199, 1204–5 (Colo.2010).

We did not find the defendant in custody in *Matheny,* even though the questioning took place in a secured area of a police station, because the defendant drove himself there voluntarily, was relaxed throughout the interview, and told his story in a narrative form with little prompting. 46 P.3d at 467.

A court may consider a broad range of factors in determining custody, but it is clear that a court may not rest its conclusion that a defendant is in custody for *Miranda* purposes upon a policeman's unarticulated plan. *Minjarez,* 81 P.3d at 353. In the case before us, the trial court did just that. It focused on the police officer's intent to arrest Klinck after questioning him at D.B.'s house:

> the key thing for the Court at this point in time is [Deputy Hays] testified very honestly under oath that *he did believe that he was going to arrest the defendant at that point in time*; that he did there ask a series of question to the defendant.... Any statements made once he was on the [porch] ... any statements made at that point should have been subject to *Miranda*

and they were not voluntary and they will be suppressed."

(emphasis added).

The trial court erred in taking Deputy Hays' subjective intent into account when determining whether Klinck's statements on the porch at D.B.'s house were subject to *Miranda. See Matheny,* 46 P.3d at 468. A trial court's inquiry into whether a suspect is in custody for purposes of *Miranda* is subject to an objective reasonable person standard. *People v. Howard,* 92 P.3d 445, 451 (Colo.2004). A reasonable person in Klinck's position would not have felt deprived of freedom to the degree associated with a formal arrest. *See Keohane,* 516 U.S. at 112, 116 S.Ct. 457.

First, the time, place, and purpose of the encounter does not support a finding of custody. *See People v. Holt,* 233 P.3d 1194, 1198 (Colo.2010) (noting that questioning taking place in a neutral location is inherently less coercive than a police dominated setting). Klinck was in a familiar location, his girlfriend's home, and the encounter lasted less than ten minutes. Deputy Hays used a conversational tone when speaking with Klinck, and asked non-confrontational, open-ended questions. *Cf. Minjarez,* 81 P.3d at 356; *Effland,* 240 P.3d at 876 (finding custody where police officer's questions provided all the details of the incident and were designed to elicit agreement from defendant).

Although Deputy Hays did not tell Klinck he was free to leave at any time, and had previously requested that Klinck remain on the porch during the questioning of D.B., the police did not handcuff Klinck or place him under any other form of physical restraint. *See Cowart,* 244 P.3d at 1204 (lack of physical restraint suggests defendant is not in custody). Klinck was calm, did not appear to be emotionally distraught, and did not request termination of the interview. *Cf. Effland,* 240 P.3d at 876 (finding custody where defendant appeared distraught and repeatedly attempted to terminate the interview, and police disregarded those requests). Ultimately, the general atmosphere and tone of the interview did not evince any attempt by the police to subjugate Klinck to the will of his examin-

er. *Matheny,* 46 P.3d at 467; *Miranda,* 384 U.S. at 457, 86 S.Ct. 1602.

As the Supreme Court acknowledged in *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. However, the consensual interview between Klinck and Deputy Hays did not exert the compulsive forces that *Miranda* sought to prevent. *See Matheny,* 46 P.3d at 468. Thus, the trial court erred in finding that Klinck was in custody on the porch at D.B.'s house for *Miranda* purposes before the police formally placed him under arrest.

### C. Voluntariness of Statements

▮ Under the due process clauses of the United States and Colorado Constitutions, a defendant's statements must be made voluntarily in order to be admissible into evidence. U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25. Statements made by a defendant that violate the parameters of *Miranda* are subject to suppression, but so long as the defendant made those statements voluntarily, the prosecution may use them for impeachment purposes. *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Effland,* 240 P.3d at 877.

▮ To be voluntary, a statement must be the product of an essentially free and unconstrained choice by its maker. *Effland,* 240 P.3d at 877; *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). Coercive government conduct, physical or mental, is necessary to find that a confession is not voluntary. *People v. Gonzalez–Zamora,* 251 P.3d 1070, 1076 (Colo.2011); *People v. Gennings,* 808 P.2d 839, 846 (Colo.1991) (for a confession to be involuntary, coercive governmental conduct must play a significant role in inducing the statement); *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The inquiry's focus is on whether the behavior of the state's law enforcement officials was such as to overbear the defendant's

will to resist and bring about a confession not freely self-determined. *Effland,* 240 P.3d at 877; *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

Whether a statement is voluntary must be evaluated on the basis of the totality of the circumstances under which it is given. *Raffaelli,* 647 P.2d at 235. Factors helpful to the voluntariness determination include, but are not limited to: whether the defendant was in custody or was free to leave and was aware of his situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived his *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system. *Gennings,* 808 P.2d at 844.

In *Gennings,* we declined to uphold a trial court's order finding a defendant's statements to a polygraph examiner involuntary when the defendant was an experienced police officer, received *Miranda* warnings at the outset of the examination, and was fully aware of his right to leave at any time. In spite of the techniques used by the polygraph examiner, including informing the defendant that he had been deceptive on the exam, and conveying a supportive attitude toward his predicament and telling him that he would feel better if he talked to her about the problem, we could not say this conduct played so significant a role in overbearing the defendant's will as to have caused the defendant's statement to be constitutionally involuntary. 808 P.2d at 846–47.

Similarly, in *People v. Valdez,* we found a defendant's statements during a custodial in-

terrogation voluntary, despite the fact that the police officer was confrontational, angry, and condemning. 969 P.2d 208, 212 (Colo. 1998). The defendant was hungry and tired and the officer denied his request for rest. *Id.* Because the defendant did not appear intimidated by the interrogating officer's behavior, we could not say the officer's behavior rose to the level of coercion, nor did the police conduct play a significant role in inducing defendant's statements. *Id.*

In *Effland,* many of the same factors that led to a finding of custody also contributed to our determination that the defendant's statements were involuntary. 240 P.3d at 878. The defendant was in a very fragile emotional state, repeatedly told the investigators that he did not wish to speak with them and desired an attorney, and the officers failed to advise him of his *Miranda* rights while confronting him with evidence against him and "essentially requesting agreement." *Id.* at 879. Petitioner was in a weakened physical and mental state and, knowing this fact, the investigating officers persisted in disregarding his requests not to discuss the event until he had consulted with counsel. *Id.; Raffaelli,* 647 P.2d at 236 (interrogation conducted in conversational tone constituted coercion when considering defendant's substantial emotional stress and accusatory nature of interrogation).

The trial court held, and the prosecution concedes, that Klinck's statements during the five hour interrogation were taken in violation of *Miranda* because Klinck had invoked his right to counsel yet the interrogation continued. Nevertheless, the prosecution contends that under the totality of the circumstances, the police conduct was not so coercive as to overbear Klinck's will to resist. *Valdez,* 969 P.2d at 212. Therefore, the statements were voluntary and are admissible for impeachment purposes. *Effland,* 240 P.3d at 878. We agree.

Klinck argues that he was in a weakened psychological state during the interrogation and the detectives took advantage of his weakness in procuring the statements. He also argues that Detective Aragon improperly led him into making statements by promising she would influence the charges against him. While Detective Aragon's assertion, "it's up to me to decide if I'm gonna file charges," approaches the boundary of unacceptable behavior, we cannot say police conduct played a significant role in inducing Klinck's statements. *See Brady v. United States,* 397 U.S. 742, 752, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (a voluntary confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence").

Like the interrogating officer in *Gennings,* the detectives informed Klinck that he had been deceptive in his previous statements and used a "soft technique" conveying a supportive attitude and encouraging him to admit wrongdoing. 808 P.2d at 846. In *Gennings,* we found these types of actions by an interrogator "psychologically coercive," but ruled they did not play such a significant role in inducing the defendant's confession as to render the confession constitutionally invalid. *Id.* at 847.

Upon reviewing the video of the five hour interrogation, we cannot say that the police techniques in this case played a significant role in prompting Klinck's jailhouse statements. *See Valdez,* 969 P.2d at 212 (finding no connection between interrogator's confrontational manner and defendant's confessional statements).

First, after the police reinitiated questioning, Klinck stated that "he wanted to get everything out in the open." While the interrogation proceeded in violation of *Miranda,* due to his prior invocation of the right to counsel, a fact that cuts in favor of finding the statements involuntary, *Raffaelli,* 647 P.2d at 235, Klinck said he wanted to speak to the detectives and was not doing so against his will.

Second, Klinck refused to allow the detectives to search his cell phone and declined to write an apology letter to D.B., stating that he did not want those items introduced as evidence. His ability to refuse the detective's requests indicates that his will was not "overborne by improper state conduct." *Valdez,* 969 P.2d at 212. Klinck understood the charges against him and has extensive expe-

rience with the law enforcement and criminal justice system; he understood that the interrogation was being videotaped and that his statements could be used against him.

Finally, the interrogation was conducted in conversational tones, the detectives were courteous, and Klinck did not request a halt to the questioning. When Klinck became tired, the detectives asked if they could ask a few more questions before continuing to pose open-ended questions. The detectives pointed to evidence contradicting Klinck's prior statements, but did not request agreement with an alternate version of events. *Cf. Effland,* 240 P.3d at 879. Instead, Klinck's narrative responses rambled on for so long that he apologized for "keeping [the detectives] so late."

Accordingly, we conclude that Klinck's statements were voluntary and not induced by significant coercive conduct by the detectives. These statements may be introduced at trial for impeachment purposes. *Id.*

### III.

We reverse the suppression order regarding the statements made on the porch, and rule that the jailhouse interrogation was voluntary and admissible for impeachment purposes only. We return this case to the district court for further proceedings consistent with this opinion.