Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2020 CO 36**

**No. 20SA11, *People v. Clark*—Criminal Law— Custodial Interrogation —
*Miranda* Warnings.**

The People have filed this interlocutory appeal, contesting the trial court's

order suppressing certain statements that the defendant made to law enforcement

during the execution of a search warrant at his home and prior to his formal arrest.

The People contend that the trial court erred in finding that the defendant was in

custody so as to trigger the requirements of *Miranda v. Arizona*, 348 U.S. 436, 478–

79 (1966), when he made the statements at issue.

The supreme court agrees with the People. Accordingly, the supreme court

reverses the trial court's suppression order and remands this case to that court for

further proceedings.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

### 2020 CO 36

### Supreme Court Case No. 20SA11
*Interlocutory Appeal from the District Court*
La Plata County District Court Case No. 19CR486
Honorable Suzanne Fairchild Carlson, Judge

_____

### Plaintiff-Appellant:

The People of the State of Colorado,

v.

### Defendant-Appellee:

Bradley Todd Clark.

_____

### Judgment Reversed
*en banc*
May 11, 2020

_____

**Attorneys for Petitioner:**
Christian Champagne, District Attorney
Sean Murray, Appellate Deputy District Attorney
Alexandra Herlong, Deputy District Attorney
    *Durango, Colorado*

**Attorneys for Respondent:**
Whitney and Schowalter
Katharine L. Whitney
Brian Schowalter
    *Durango, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.

¶1    The People have filed this interlocutory appeal, contesting the trial court's order suppressing certain statements that defendant Bradley Todd Clark made to law enforcement during the execution of a search warrant at his home and prior to his formal arrest. The People contend that the trial court erred in finding that Clark was in custody so as to trigger the requirements of *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966), when he made the statements at issue.

¶2    We agree with the People. Accordingly, we reverse the trial court's suppression order and remand this case to that court for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶3    Shortly after 8:00 p.m. one evening, Durango firefighters were dispatched to the City Market South grocery store in Durango to address a fire inside the store. The firefighters quickly determined that the fire had been set intentionally, and they requested assistance from the Durango Police Department. Officers from that department arrived shortly thereafter.

¶4    Based on witness statements, the fact that the fire did not spread beyond the tortilla chip section of aisle 7 of the store, and the fire marshal's investigation, it was determined that the fire originated in the tortilla chip section of aisle 7. The fire marshal believed that the entire duration of the fire was two to three minutes.

2

¶5 Due to the location of the fire and information allowing them to determine when the fire began, a police officer and a detective watched surveillance footage relating to the events surrounding the incident, in the hope of identifying a suspect. Based on their review of the footage, the officer and the detective were able to do so. Specifically, they pinpointed a male suspect who was alone in the area of the fire for approximately forty-six seconds. He left the area, and thirty-four seconds later, a witness observed several bags of chips burning in that location. The suspect then walked to one of the self-checkout lines and purchased several items. From this transaction, the officer and the detective were able to identify the man as Clark, and they were also able to obtain his address.

¶6 The next day, the detective who had reviewed the surveillance footage obtained a search warrant for certain items located in Clark's home, and that night, at approximately 10:30 p.m., four officers from the Durango Police Department went to Clark's home to execute the warrant. Three of the officers were wearing what was described as "detective" clothes (presumably, plain clothes), and the fourth was in uniform.

¶7 As the officers approached Clark's house and were about to knock on the door, one of the officers thought that she saw the lights go on and the front door open and close. The officers proceeded to knock, and they identified themselves as Durango police officers. Clark opened the door, and the police officers advised

3

him that they were there with a search warrant to search for items relating to the incident the previous day at City Market. One of the detectives, Detective Newman, then provided Clark with a copy of the warrant.

¶8 Notwithstanding the fact that an officer had just seen a light on and watched the front door open and close, Clark initially claimed that he had been in bed. Detective Newman then asked Clark whether he had a wife and children at home. Clark responded that he did and that they were upstairs sleeping. Detective Newman proceeded to advise Clark, "I'd like to talk to you about [the items in the search warrant]. If you're willing to talk about those things, that would be great." Clark agreed to help the detectives locate the items listed in the warrant, although he repeatedly asked Detective Newman, "What things?" and the detective repeatedly pointed out the things listed in the warrant.

¶9 Detective Newman then asked Clark if he had been at City Market the day before, and Clark responded that he had been there three times, the last of which was at about 7:30 p.m. The detective advised Clark that he was most interested in this last trip, and he repeatedly asked Clark if Clark would be willing to talk to him. Clark never responded to this question, nor did he respond directly to other questions asked of him. Instead, he continually asked the detective why the officers had come to his home at 10:30 p.m. on a Sunday. Detective Newman patiently responded to Clark's questions and continued to try to engage Clark

4

about the incident. Clark, however, deflected the detective's questions, stating repeatedly that he did not know why they had come to his home, that he did not know anything about "the incident," and that the police officers' presence in his home was "insane."

¶10 After fencing with Clark like this for several minutes, Detective Newman told Clark, "So, here's the deal. I wanna . . . . I'm gonna take you outside, okay? We're going to go outside for a minute, and we're gonna chat so these guys can do the job searching for stuff, okay?" Clark and the detective then talked for another minute or so about whether Clark would be willing to go outside with the detective, as well as about the items listed in the search warrant, about which Clark continued to profess ignorance. Finally, the deputy police chief, who was also present, stated, "You're not going to be arrested, we're not arresting you outside. We're stepping outside so we're not talking in front of your family." Upon hearing that, Clark agreed to go outside stating, "Totally man, I have kids." Clark then asked if he could put his shoes on before going outside, but he ultimately went outside barefoot because none of the shoes by the door were his.

¶11 Once outside, Clark initially refused to talk more about his third trip to City Market, and he denied knowing anything about the incident. He eventually admitted, however, that he was at City Market when the fire alarms went off, although he continued to deny any knowledge of what triggered the alarms. Clark

5

then stated that he knew that he did not have to say anything more to the police without an attorney present, which Detective Newman confirmed, but Clark kept talking, and he continued to say that he did not know why the police were at his home.

¶12 Then, notwithstanding his prior statement that he knew nothing about the incident, Clark said that he knew about the fire because he had read about it on the internet and that he and his wife had "joked about it." At this point, having heard Clark contradict himself a number of times, Detective Newman told Clark that there were video cameras in the store and that based on the footage, Clark was the suspect.

¶13 After Clark continued to fence with Detective Newman, the detective finally told Clark that he "was not going to play this game" and advised Clark that he was under arrest for the arson at City Market. Clark responded, with apparent surprise, "What? Are you kidding me?" and again said, "I mean this is insane, it's insane." Detective Newman instructed another officer who had been standing in the middle of the street with one of the police cars to handcuff Clark. Clark continued to ask whether the police were kidding, even wondering if "this is not a joke for [his] students?" (Clark was a professor at Fort Lewis College at the time.) The officer then placed Clark in the police car, and Detective Newman offered to get him sweats, socks, and shoes and allowed him to speak with his wife.

6

¶14    At all times in the course of this interaction, Detective Newman was courteous, respectful, calm, and professional, and he spoke with Clark in a conversational tone.  At no time did Detective Newman raise his voice, although an audio recording of the entire interaction reflects some eventual frustration with what the detective viewed as a "game" that Clark was playing with him.

¶15    The People subsequently charged Clark with criminal attempt to commit first degree arson, second degree arson, and criminal mischief.  Clark pleaded not guilty and, as pertinent here, moved to suppress all of the statements that he made during the above-described encounter.  He argued that these statements were made in the course of a custodial interrogation without the benefit of *Miranda* warnings and that all of such statements should therefore be suppressed.

¶16    The trial court subsequently conducted an evidentiary hearing on Clark's motion.  At this hearing, Detective Newman testified that on the evening in question, he and three other officers went to Clark's house to execute the search warrant.  They found Clark barefoot and in boxer shorts and a sweatshirt.  After speaking with Clark inside the house, Detective Newman asked Clark to go outside, which he did, without putting on any more clothes.  While Detective Newman spoke with Clark outside, the other officers searched the home.  Detective Newman testified that he did not place Clark in handcuffs while the two were talking, nor did he put any other kind of restraints on Clark or otherwise

7

limit Clark's movement. The detective further testified that he did not provide Clark with a *Miranda* advisement, and he stated that after he placed Clark under arrest, he did not question Clark further.

¶17 In addition to the foregoing, the People introduced into evidence the above-referenced audio recording of the entire encounter with Clark.

¶18 At the conclusion of the evidence, the court ruled from the bench that Clark was in custody from the time he went outside with Detective Newman and that *Miranda* warnings were therefore required at that point. In support of this conclusion, the court found that although Detective Newman was "pretty low key" and conversational and did not "get loud" throughout the encounter, and although all of Clark's statements were voluntary, (1) Clark was directed to go outside, (2) he was in his underwear and had no shoes on when he was so directed, (3) this encounter occurred late at night, and (4) the tone of the encounter became a "little bit confrontational" once Clark went outside. Based on these facts, the court concluded that "no reasonable person would think that they had not been deprived of their freedom at the point where they would have to go outside in their underwear without their shoes on." Accordingly, the court found that "*Miranda* was required at the time that [Clark] went outside, when he was told he was going outside. . . . [A]t that point a reasonable person would think that they had been deprived of their freedom of action to the degree associated with a formal

8

arrest based on all of the factors." The court thus granted in part Clark's motion to suppress and suppressed any statements that Clark made after he went outside with Detective Newman.

¶19 The People then brought this interlocutory appeal challenging the court's suppression order.

## II. Analysis

¶20 We begin by addressing the applicable standard of review. We then discuss the pertinent principles of law. We end by applying these principles to the record before us, and we conclude that Clark was not in custody when he made the statements at issue, all of which were made while Clark spoke with Detective Newman outside and prior to Clark's formal arrest. Accordingly, we further conclude that the trial court erred in suppressing those statements as the product of a custodial interrogation conducted without the requisite *Miranda* warnings.

## A. Standard of Review

¶21 A trial court's determination of whether a defendant was in custody when he or she was interrogated presents a mixed question of law and fact. *People v. Davis*, 2019 CO 84, ¶ 18, 449 P.3d 732, 738. We defer to the trial court's findings of historical fact and credibility as long as those findings are supported by competent evidence in the record. *Id.* We review de novo, however, the legal question of whether the facts, when taken together, establish that the suspect was in custody

9

at the time he or she was interrogated. *People v. Pleshakov*, 2013 CO 18, ¶ 16, 298 P.3d 228, 232.

¶22 In reviewing a trial court's determination, our analysis is not limited to the factual findings on which the trial court based its order. *Davis*, ¶ 18, 449 P.3d at 738. Rather, we may also consider any undisputed facts in the record. *Id.*

¶23 In addition,

> "[W]here the statements sought to be suppressed are audio- and video-recorded, and there are no disputed facts outside the recording controlling the issue of suppression, we are in a similar position as the trial court to determine whether the statements should be suppressed." Thus, we may undertake an independent review of the audio or video recording to determine whether the statements were properly suppressed in light of the controlling law.

*People v. Kutlak*, 2016 CO 1, ¶ 13, 364 P.3d 199, 203 (quoting *People v. Madrid*, 179 P.3d 1010, 1014 (Colo. 2008)).

## B. Law Relating to Custodial Interrogations

¶24 "The Fifth Amendment to the United States Constitution guarantees that 'no person . . . shall be compelled in any criminal case to be a witness against himself.'" *Pleshakov*, ¶ 19, 298 P.3d at 233 (quoting U.S. Const. amend. V). A person subjected to a custodial interrogation is afforded certain procedural safeguards to secure this Fifth Amendment privilege. *Miranda*, 384 U.S. at 478–79. Specifically, the state may not introduce in its case-in-chief statements made by a defendant during a custodial interrogation unless the state establishes that the defendant was advised

that (1) the defendant has the right to remain silent; (2) anything that the defendant says can be used against him or her in a court of law; (3) the defendant has the right to the presence of an attorney; and (4) if the defendant cannot afford an attorney, then one will be appointed for him or her prior to questioning, if desired. *Id.* at 479.

¶25 A person is in custody for *Miranda* purposes when he or she "has been formally arrested or if, under the totality of the circumstances, a reasonable person in the suspect's position would have felt that [his or] her freedom of action had been curtailed to a degree associated with formal arrest." *People v. Garcia*, 2017 CO 106, ¶ 20, 409 P.3d 312, 317.

¶26 "A *Miranda* custody assessment considers 'the objective circumstances of the interrogation, not . . . the subjective views harbored by either the interrogating officers or the person being questioned.'" *Davis*, ¶ 19, 449 P.3d at 738 (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)). "In making this determination, a court must consider the totality of the circumstances under which the interrogation was conducted." *Mumford v. People*, 2012 CO 2, ¶ 13, 270 P.3d 953, 957. The factors that the court should consider include:

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the

defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*People v. Matheny*, 46 P.3d 453, 465–66 (Colo. 2002) (citation omitted).

¶27    This list is not exhaustive, and therefore, no single factor is determinative. *Mumford*, ¶ 14, 270 P.3d at 957.

## C. Application

¶28    Applying these principles to the case at hand, we conclude that, under the totality of the circumstances, Clark was not in custody for *Miranda* purposes at the time he made the statements at issue, all of which were made while Clark spoke with Detective Newman outside Clark's home and prior to his formal arrest. We reach this conclusion for a number of reasons.

¶29    First, the encounter at issue occurred at Clark's home, with the bulk of the conversation occurring inside the house and a portion of it occurring just outside Clark's front door. We have said that such facts weigh against a finding of custody. *See Garcia*, ¶ 21, 409 P.3d at 317 ("When the interaction occurs at the person's home or at a familiar location, it weighs against a finding of custody. . . . We have also recognized that the area just outside a familiar residence can be a neutral location.").

12

¶30 Second, the encounter outside Clark's home was relatively brief, lasting approximately six minutes, and we have opined that when an encounter like the one at issue was brief, that fact weighs against a finding of custody. *See People v. Klinck*, 259 P.3d 489, 494 (Colo. 2011) (concluding that the defendant was not in custody when, among other things, the encounter lasted less than ten minutes); *cf. People v. Minjarez*, 81 P.3d 348, 356 (Colo. 2003) (concluding that the defendant was in custody when, among other things, the interview lasted forty-five minutes).

¶31 Third, Detective Newman's conversational tone and his generally non-confrontational and open-ended questions throughout his encounter with Clark also support a finding that Clark was not in custody. *See, e.g.*, *Klinck*, 259 P.3d at 494 (relying on a deputy's use of a conversational tone and non-confrontational, open-ended questions to conclude that the defendant was not in custody); *People v. Cowart*, 244 P.3d 1199, 1205 (Colo. 2010) (stating that the officer's conversational tone and the fact that he did not raise his voice convinced the court that the defendant was not in custody).

¶32 Fourth, as noted above, the deputy police chief on scene specifically told Clark, "You're not going to be arrested, we're not arresting you outside. We're stepping outside so we're not talking in front of your family," to which Clark replied, "Totally man, I have kids." These facts, too, weigh against a finding that Clark was in custody, and they tend to show that Clark went outside of his own

13

volition in order to speak with the police out of earshot of his children. *See, e.g.*, *Matheny*, 46 P.3d at 467 (opining that statements to the defendant that he was not under arrest and that he was free to go at any time weighed against a finding of custody).

¶33 Fifth, although four officers were on site, only Detective Newman asked Clark any questions, and, at least until Clark was arrested, Clark was not handcuffed or restrained in any way. We have previously relied on the fact that only a single officer spoke with a suspect in concluding that the suspect was not in custody during the encounter at issue. *See, e.g.*, *People v. Figueroa-Ortega*, 2012 CO 51, ¶ 9, 283 P.3d 691, 693 (perceiving as indicative of a consensual encounter and not custody the fact that the officer who had conducted the interview at issue did so alone and in civilian clothes); *see also Pleshakov*, ¶ 30, 298 P.3d at 235 (concluding that the defendant was not in custody when, among other things, four officers were at the scene but only one spoke with the defendant). Likewise, we have relied on the absence of handcuffs or other restraints as suggesting that the suspect was not in custody. *See, e.g.*, *Pleshakov*, ¶ 30, 298 P.3d at 235 (relying on the fact that neither the defendant nor his companions were handcuffed at the time the defendant made incriminating statements in concluding that the defendant was not in custody); *Figueroa-Ortega*, ¶ 9, 283 P.3d at 693 (relying on the fact that the defendant's movement was in no way restrained in concluding that the

14

defendant was not in custody); *Cowart*, 244 P.3d at 1204 (noting that the lack of physical restraint suggested that the defendant was not in custody).

¶34 Finally, Clark's responses to Detective Newman while the detective was speaking with him outside his home support a finding that Clark was not in custody. We have observed that "indifferent" reactions to the police tend to suggest that a suspect is not "succumbing to any allegedly coercive police influences." *Garcia*, ¶ 36, 409 P.3d at 319. Here, in response to Detective Newman's questions about Clark's trip to City Market, Clark repeatedly stated that he had no knowledge of the incident at issue, and he questioned why the police were speaking with him, given that other people were in the store that day. At no point did Clark confess to committing the arson at City Market, including after being told that the police saw him on the store's surveillance video. To the contrary, throughout the encounter, Clark generally deflected questions from Detective Newman while repeatedly asking what items the police were seeking and expressing his lack of understanding as to why the police were there and how "insane" it all was. In our view, this conduct, which Detective Newman ultimately perceived as gamesmanship, does not suggest a person who believed that he was in custody or who had in any way succumbed to any sort of coercive police interrogation.

¶35 This is not to say that none of the above-quoted *Matheny* factors could arguably support a finding that Clark was in custody. As the trial court observed, the fact that the police came to Clark's home between 10:30 and 11:00 p.m. on a Sunday night tends to support a finding of custody, as does the fact that Detective Newman effectively directed Clark to go outside with him, notwithstanding that Clark was barefoot and wearing only a sweatshirt and underwear at the time. *See Garcia*, ¶ 35, 409 P.3d at 319 (noting that a direction given by an officer to a suspect is one factor that weighs in favor of a finding of custody); *Matheny*, 46 P.3d at 465 (noting that the time of an encounter is relevant to the custody determination).

¶36 Nonetheless, as set forth above, in deciding whether Clark was in custody, we must consider the totality of the circumstances. *Mumford*, ¶ 13, 270 P.3d at 957. And for the reasons discussed above, the totality of the circumstances here, as well as our own review of the audio recording of the encounter at issue, convinces us that Clark was not in custody when Detective Newman spoke with him just outside his front door.

## III. Conclusion

¶37 For these reasons, we conclude that Clark was not in custody for *Miranda* purposes when Detective Newman questioned him just outside his home regarding the fire that had occurred at City Market the day before. Accordingly,

16

we conclude that the trial court erred in suppressing the statements that Clark made at that time.

¶38     We therefore reverse the trial court's suppression order and remand this case to that court for further proceedings consistent with this opinion.