482 P.3d 441
The PEOPLE of the State of Colorado, Plaintiff-Appellant,
v.Jose PADILLA, Jr., Defendant-Appellee
Supreme Court Case No. 20SA336 Supreme Court of Colorado.
March 22, 2021
Attorneys for Plaintiff-Appellant: Daniel H. May, District Attorney, Fourth Judicial District, Susan Chadderdon, Deputy District Attorney, Tanya A. Karimi, Deputy District Attorney, Colorado Springs, Colorado
Attorneys for Defendant-Appellee: Megan A. Ring, Public Defender, Summer Woods, Deputy Public Defender, Colorado Springs, Colorado
En Banc
CHIEF JUSTICE BOATRIGHT delivered the Opinion of the Court.
¶1 Two detectives questioned Jose Padilla about his involvement in a potential sexual assault. In response, Padilla stated that he did not have sex with the victim, J.M., and that J.M. was extremely intoxicated on the night in question. He later moved to suppress these statements, arguing that they were obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The district court agreed and granted the motion to suppress, finding that Padilla was subjected to custodial interrogation without the required Miranda warnings.
¶2 The People filed this interlocutory appeal, challenging the district court's order. Because we conclude that Padilla was not in custody for Miranda purposes, we reverse the portion of the district court's order suppressing the statements and remand this case for further proceedings consistent with this opinion.
I. Facts and Procedural History1 ¶3 J.M. told police that Padilla had sexually assaulted her. Law enforcement attempted to contact Padilla about this allegation numerous times. Eventually, Detective Gardner reached out to Padilla's probation officer, who relayed that Padilla had an upcoming probation appointment at the El Paso County Probation Department, located within the judicial building. The probation officer agreed to help him arrange a meeting with Padilla after this appointment. When Detective Gardner and Detective Gurule arrived at the Probation Department, Padilla's probation officer told them that she had informed Padilla of their presence and desire to speak with him. She then led the detectives into a windowless conference room to wait for Padilla.
¶4 The conference room was large enough to seat approximately ten people around a large conference table. The detectives were dressed in their "soft uniforms" — navy blue polo shirts with Colorado Springs Police Department logos and tan pants — and carried their badges and service weapons. Padilla entered the conference room and sat down between the detectives by the closed, unlocked door. The audio recording of the subsequent interrogation yields the following facts.
¶5 After introducing himself and Detective Gurule, Detective Gardner asked Padilla how much time he had. Padilla responded that he had to be in class soon and planned to cash a check beforehand. Detective Gardner, confirming that they had only a few minutes, said that was "perfect." Detective Gardner then stated, "Sounds like you know why we're here. We've been trying to get ahold of ya." Padilla continued to discuss his schedule, explaining that he had been very busy lately, especially because he would be starting a work release sentence that evening. Detective Gardner stated that police had been trying to contact Padilla for a few months, to which Padilla responded, "I'm not avoiding you. I'll sit down and talk to you, but I mean, honestly, ... it'd probably be better, man, if we could set up an appointment and we could just meet up then and just, we can talk about whatever you want." Detective Gardner responded, "That's perfectly fine." This exchange was calm, with both parties speaking in a conversational tone.
¶6 Detective Gardner then stated, "We can completely set up an appointment to get some more details. But obviously, just based on the allegation, did you have any sort of sexual encounter with [J.M.] at all?" Padilla calmly replied, "No," and explained that he had spoken with his wife and with J.M.'s husband about the evening in question. Detective Gardner responded, "I mean, I understand, things happen ... I get that, that that happens sometimes." Padilla then provided a narrative of his side of the events, stating that J.M. was "really drunk," that she initiated the encounter, and that he stopped it from escalating beyond her initial advances. He also said that he didn't immediately tell his wife because of J.M.'s intoxication, thinking that she would "sleep it off" and not say anything. He continued talking calmly for several minutes, and Detective Gardner did not interrupt him, save for confirmations like "okay" and "that's what your wife told me."
¶7 Padilla ended his narrative with, "Like I said, I'll talk to you about anything," explaining that he had told his wife and J.M.'s husband that he was willing to do a DNA or lie detector test when J.M. first made allegations because he was "trying to prove [his] innocence." Detective Gardner noted that a DNA test would be a straightforward way for Padilla to clear his name and asked, "Is that something you'd still be willing to do?" Padilla responded immediately, "Pshh right now," chuckling a bit. Detective Gardner confirmed, "You want to do it right now?," to which Padilla responded, "Yeah." Detective Gardner said that he had brought along a DNA test—because he knew Padilla had mentioned to multiple people that he would be willing to take one—and said, "So we'll do that now, and then we'll set up a time to meet, ... 'cause I don't wanna screw up your day. Okay, does that work?" Padilla answered "yes" and "yeah" throughout. Padilla then signed a consent form and took the DNA test.
¶8 Afterward, Detective Gardner asked, "When would be a good time for us to meet, you think?" Padilla paused, then stated his work release schedule again. Detective Gardner responded, "So that would put us you know ... two weeks from now or something like that. Let's try to schedule, and that way we can talk a little bit more detail about how things built up over the night, what she was doing, everything that was going on." Padilla said, "Yeah, that's smart." As the interrogation wrapped up, Detective Gardner simply stated, "Sounds good. Appreciate it. Thank you. Good luck with everything, I'll be in touch." Padilla exited the room without waiting for any specific permission or being told he was free to go. The entire interaction lasted approximately ten minutes.
¶9 Laboratory results later showed a match for Padilla's DNA on swabs taken from J.M. on the night of the alleged sexual assault. The People subsequently charged Padilla with two counts of sexual assault. He later moved to suppress all statements and evidence obtained by police during the interview, claiming that they stemmed from an unconstitutional interrogation. It was undisputed that the interview amounted to an interrogation and that the detectives hadn't given Miranda warnings. Thus, the issue was whether Padilla was in custody for Miranda purposes.
¶10 The district court held a suppression hearing, and it granted Padilla's motion in part. In its oral ruling, the district court stated that it evaluated the totality of the circumstances of the interrogation in accordance with People v. Matheny, 46 P.3d 453, 465-66 (Colo. 2002). It then found that the following factors weighed in favor of finding that Padilla was in custody:
• the time, place, and purpose of the encounter, because the probation appointment was mandatory and Padilla's probation officer exerted a high degree of influence over him that day because Padilla had recently violated his probation;
• the persons present during the interrogation, because Padilla didn't know the detectives and did not have any representative with him;
• the words spoken by officers to the defendant, because the detectives did not tell Padilla that he was not under arrest or that he was free to leave, and because the detectives "bypassed" Padilla's request that they "reschedule" the meeting;
• the officer's tone of voice and general demeanor, because the questioning seemed "pressured";
• the length and mood of the interrogation , again because the mood was "pressured"; and
• the officer's response to any questions asked by the defendant , again because the detectives "bypassed" Padilla's request that they "reschedule."
¶11 Thus, the district court ordered that Padilla's statements be suppressed. But it denied the motion with respect to the DNA evidence, finding that the DNA evidence was inevitable discovery and that future samples would be no different.
¶12 The People brought this interlocutory appeal, challenging the district court's order suppressing the statements made by Padilla.2 II. Analysis
¶13 We begin by outlining the appropriate standard of review. We then discuss the law relating to custody for Miranda purposes. We next apply these principles to the record before us and hold that Padilla was not in custody when he made the statements at issue, meaning the district court erred in suppressing the statements. Accordingly, we reverse that portion of the district court's suppression order and remand the case for further proceedings consistent with this opinion.
A. Standard of Review ¶14 A trial court's determination of whether a defendant was in custody when he was interrogated presents a mixed question of law and fact. People v. Clark , 2020 CO 36, ¶ 21, ––– P.3d ––––. We defer to the trial court's findings of historical fact and credibility as long as those findings are supported by competent evidence in the record. Id. But our analysis is not strictly limited to the factual findings that form the basis of the trial court's order; we may also consider undisputed facts in the record. People v. Davis, 2019 CO 84, ¶ 18, 449 P.3d 732, 738. Also, we may independently review audio-recorded interrogations:
"[W]here the statements sought to be suppressed are audio- and video-recorded, and there are no disputed facts outside the recording controlling the issue of suppression, we are in a similar position as the trial court to determine whether the statements should be suppressed." Thus, we may undertake an independent review of the audio or video recording to determine whether the statements were properly suppressed in light of the controlling law. Clark, ¶ 23 (quoting People v. Kutlak, 2016 CO 1, ¶ 13, 364 P.3d 199, 203 ). Finally, we review de novo the legal question of whether the facts, taken as a whole, establish that the suspect was in custody when he was interrogated. Id. at ¶ 21.
B. Law Relating to Custody for Miranda Purposes ¶15 The Fifth Amendment to the United States Constitution ensures that no criminal defendant may be compelled to testify against himself. In Miranda, the U.S. Supreme Court held that, to secure this Fifth Amendment right, a person subjected to custodial interrogation must be afforded certain procedural safeguards; specifically, police must provide warnings that inform the person of his right against self-incrimination. 384 U.S. at 478-79, 86 S.Ct. 1602. If police fail to give these warnings, the state may not introduce, in its case-in-chief, statements made by a defendant during the custodial interrogation. Id. at 444-45, 86 S.Ct. 1602. But Miranda warnings are required only when a person is both in custody and subjected to police interrogation. People v. Garcia, 2017 CO 106, ¶ 19, 409 P.3d 312, 317. ¶16 "A person is in custody for Miranda purposes if [he] has been formally arrested or if, under the totality of the circumstances, a reasonable person in the suspect's position would have felt that [his] freedom of action had been curtailed to a degree associated with formal arrest." Id. at ¶ 20, 409 P.3d at 317. "A Miranda custody assessment considers ‘the objective circumstances of the interrogation, not ... the subjective views harbored by either the interrogating officers or the person being questioned.’ " Davis, ¶ 19, 449 P.3d at 738 (quoting Stansbury v. California, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) ). "In making this determination, a court must consider the totality of the circumstances under which the interrogation was conducted." Mumford v. People, 2012 CO 2, ¶ 13, 270 P.3d 953, 957. We have outlined a nonexhaustive list of nine factors for courts to consider when assessing the circumstances of the encounter between the defendant and the police:
(1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions. Matheny, 46 P.3d at 465-66 (quoting People v. Trujillo, 938 P.2d 117, 124 (Colo. 1997) ). No single factor is determinative. Clark, ¶ 27. With these principles in mind, we turn to the facts of this case.
C. Application
¶17 In this case, the suppressed statements were audio-recorded. The district court also made two findings of undisputed fact outside the bounds of the recording that bear on whether Padilla was in custody: (1) that Padilla was required to attend his probation appointment, and his probation officer exerted a good deal of influence over him that day; and (2) that police had attempted to contact Padilla for several months before the interrogation, and Padilla had intentionally avoided them. Therefore, with no disputed facts outside the recording, we may conduct an independent review of the recording in conjunction with the district court's findings to determine whether the statements should be suppressed. To make this determination, we apply the Matheny factors. ¶18 First, as to the time, place, and purpose of the encounter, we note that the interrogation took place at the El Paso County Probation Department. Padilla was in the Probation Department to attend a mandatory probation meeting. After that meeting, Padilla's probation officer brought him to meet with the detectives. Following initial introductions, the probation officer left and Padilla sat down to talk with the detectives in a windowless, unlocked conference room. Detective Gardner had previously made numerous attempts to contact Padilla to discuss the allegations with him; therefore, Padilla knew that he was being investigated for a sexual assault.
¶19 Second, as to the persons present during the interrogation, Padilla did not have a representative with him. There were two detectives present, and Padilla was unfamiliar with both.
¶20 Third, with respect to the words spoken by the officers to the defendant, and fourth, with respect to the officer's tone of voice and general demeanor, Detective Gardner's words were nonconfrontational and his tone and general demeanor remained friendly throughout the interrogation. When Padilla first entered the room, Detective Gardner asked him how much time he had, and while Padilla indicated a preference to talk at a later date, Padilla agreed that he had a few minutes before he needed to leave. Detective Gardner accepted the terms set by Padilla and stated that talking for just a few minutes was "perfect." Detective Gardner never raised his voice, and he maintained a conversational tone throughout the encounter. He allowed Padilla to discuss his schedule and work release sentence—topics that had no bearing on the investigation—without interrupting, even though he knew their time was limited. At one point, Detective Gardner implied that Padilla was holding back about a sexual encounter with J.M. It is evident, however, that the detective was talking about the possibility of a consensual, extramarital affair, noting that "that happens sometimes." At the end of the interrogation, Detective Gardner stated that he was appreciative of Padilla's time and wished him good luck.3 ¶21 Fifth, regarding the length and mood of the interrogation, the interrogation lasted only ten minutes, and the mood was casual: Detective Gardner indicated that he was there as a fact finder and was open to believing Padilla; Padilla chuckled when discussing his willingness to take a DNA test; and a large portion of the ten-minute interrogation was spent discussing Padilla's schedule and work release sentence.4 ¶22 With respect to the remaining Matheny factors, the detectives neither touched Padilla, nor placed him in any physical restraints. Padilla did not ask any questions, and the detectives did not give any directions.
¶23 A review of the Matheny factors, therefore, shows that some facts weigh in favor of finding that Padilla was in custody. These include that Padilla's probation appointment was mandatory, his probation officer exerted a good deal of influence over Padilla that day, and the Probation Department conference room more closely resembled a traditional interrogation room than other settings. Cf. Garcia, ¶¶ 21-22, 409 P.3d at 317 (noting that a location such as one's home or a public space weighs against finding a defendant was in custody). Padilla also did not know the detectives and did not have any representative or neutral party present. Cf. Matheny, 46 P.3d at 467 (noting that the defendant had interacted with the interrogating officers before and that the defendant's mother was present at the interrogation).
¶24 Conversely, other facts suggest that Padilla was not in custody. Detective Gardner remained nonconfrontational and friendly in his questioning and demeanor. See, e.g., People v. Klinck, 259 P.3d 489, 494 (Colo. 2011) (holding that a deputy's use of nonconfrontational, open-ended questions and a conversational tone weighed against finding that the defendant was in custody).5 Also, the conversation was short in length and casual in mood. See Clark, ¶ 30 (finding that the brevity of an encounter weighed against custody); Klinck, 259 P.3d at 494 (same). Notably, Padilla himself dictated that it would be a short encounter, and the conversation centered on Padilla's schedule and availability. Detective Gardner was deferential to Padilla's terms and, as a result, the encounter lasted only ten minutes. Finally, Padilla was not restrained or given directions by the detectives. See Clark, ¶ 33 (discussing cases that have "relied on the absence of handcuffs or other restraints as suggesting that the suspect was not in custody"); Garcia, ¶ 28, 409 P.3d at 318 (partially relying on the fact that officers did not give any directions to the defendant to hold that the defendant was not in custody).
¶25 In weighing all the facts, we place particular emphasis on the fact that Padilla dictated the length of the interrogation. While no one factor is determinative, this fact is significant because a reasonable person who sets the length of an interrogation is unlikely to believe that his freedom of action has been curtailed to a degree associated with formal arrest. Simply put, the time, mood, topics, and length of the conversation made it clear that Padilla was leaving the room of his own accord after a short period of time.
¶26 With all of these facts in mind, we conclude that under the totality of the circumstances, a reasonable person in Padilla's position would not have felt that his freedom of action had been curtailed to a degree associated with formal arrest. Hence, Padilla was not in custody for Miranda purposes.
III. Conclusion
¶27 Accordingly, we conclude that the district court erred in suppressing the statements in question. We therefore reverse that portion of the district court's suppression order and remand this case for further proceedings consistent with this opinion.
1 We derive the facts from the transcript of the district court's suppression hearing and an audio recording of the interrogation.
2 Pursuant to C.A.R. 4.1(a), the People certify that the suppressed evidence constitutes "a substantial part of the proof of the charge pending against the defendant." Defendant does not object to the certification.
3 The district court found that Detective Gardner "bypassed" Padilla's request that they "reschedule" a discussion of the matter. While Detective Gardner did not defer to Padilla's preference that they meet at a later date, Padilla made it clear that he could talk for only a short time before he had to leave.
4 While Detective Gardner and Padilla may have been speaking quickly at times, we do not conclude, as the district court did, that Detective Gardner's tone or the interrogation's mood was "pressured." For the reasons just stated, our independent review of the audio recording shows that Detective Gardner's tone was nonconfrontational and that the mood was casual.
5 In holding that the detectives' words supported a finding of custody, the district court emphasized what the detectives did not say: they never told Padilla that he was not under arrest or that he was free to go. True, these types of statements can be relevant to a finding that a defendant was not in custody. See Matheny, 46 P.3d at 467 (holding that the defendant was not in custody in part because he was told that he was not under arrest and that he was free to go). But the absence of such statements does not necessarily prove that a defendant was in custody. In any event, the test is one of the totality of the circumstances, and no one factor is determinative. Mumford, ¶¶ 13-14, 270 P.3d at 957.